**UNITED STATES of America,
Appellant,**

v.

**Eva Mae CLANTON, Appellee.**

**No. 5967.**

United States Court of Appeals
Tenth Circuit.

March 23, 1959.

Hubert A. Marlow, Asst. U. S. Atty., Northern District of Oklahoma, Tulsa, Okl. (Robert S. Rizley, U. S. Atty., Northern District of Oklahoma, Tulsa, Okl., was with him on the brief), for appellant.

No appearance for appellee.

Before BRATTON, Chief Judge, and PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

The United States appeals from a portion of the judgment of the District Court refusing forfeiture of a 1954 Mercury automobile owned by appellee. Forfeiture was claimed by libel alleging an unlawful use of the vehicle in violation of 18 U.S.C.A. § 1262 [1] by virtue of 18 U.S.C.A. § 3615. [2] The trial court concluded that the Mercury automobile had not been used in the transportation of liquor into Oklahoma within the prohibition of the applicable statutes, supra.

The findings of the court below reveal that "on June 5, 1957, Investigators of the Alcohol Tobacco Tax Unit of the Internal Revenue Service pursued a 1954 Ford automobile on Kansas State Highway No. 26 and on U. S. Highway No. 66 in the State of Kansas in a southwesterly direction toward the State of Oklahoma and in the State of Kansas they lost sight of the Ford; that one and one-half hours later the Investigators found the Ford automobile at a residence in North Miami, Oklahoma; that at that time Clyde Winton Jenkins and Norman Lee Akin were observed transferring a quantity of liquor from the 1954 Ford into the respondent 1954 green Mercury; that after the liquor was transferred into the respondent Mercury automobile it did not move from its location; and that at that time the Investigators of the Alcohol Tobacco Tax Unit seized the respondent Mercury automobile and 68.-80 wine gallons of assorted taxpaid liquors." Supplementing detail may be added to these basic facts by undisputed evidence contained in the record. The pursuit of the Ford over the highways of Kansas was a frantic chase, the cars obtaining speeds in excess of 100 miles per hour. A road block was set up and run through and eventually the vehicles of both pursued and pursuer were damaged by collision with each other and with various objects struck during the course of the chase. The occupants of the Ford, Jenkins and Akin, were known to the investigators as reputed liquor dealers at Afton, Oklahoma, who used both the Ford and Mercury automobile to haul liquors from neighboring states into Oklahoma. And finally it seems undisputed, at least by the posture of the case as presented on appeal, that the original intended destination of the liquor was Afton, Oklahoma, but the Mercury was not originally intended to

1. "Whoever imports, brings, or transports any intoxicating liquor into any State, Territory, District, or Possession in which all sales, except for scientific, sacramental, medicinal, or mechanical purposes, of intoxicating liquor containing more than 4 per centum of alcohol by volume or 3.2 per centum of alcohol by weight are prohibited, otherwise than in the course of continuous interstate transportation through such State, Territory, District, or Possession or attempts so to do, or assists in so doing,

"Shall (1) If such liquor is not accompanied by such permits, or licenses therefor as may be required by the laws of such State, Territory, District, or Possession or (2) if all importation, bringing, or transportation of intoxicating liquor into such State, Territory, District, or Possession is prohibited by the laws thereof, be fined not more than $1,000 or imprisoned not more than one year, or both."

2. "All liquor involved in any violation of Sections 1261–1265 of this title, the containers of such liquor, and every vehicle or vessel used in the transportation thereof, shall be seized and forfeited and such property or its proceeds disposed of in accordance with the laws relating to seizures, forfeitures, and dispositions of property or proceeds, for violation of the internal-revenue laws."

be used in the transportation of the contraband to that town. The liquor was stopped at North Miami and was being transferred from the Ford to the Mercury because of the pursuit and the physical disablement of the Ford car.

■ Although the Mercury was not actually moved after it was loaded with liquor and was not intended to be used at all had the initial plan of importation been completed without incident, neither fact is, ipso facto, fatal to the government's case for forfeiture.

■■ It is the transportation of the liquor, not the use of the vehicle, that is the forbidden conduct, which conduct incidentally renders every vehicle used in furtherance of the unlawful importation subject to forfeiture. The crime is a continuing one, encompassing all activities toward the accomplishment of the desires of its perpetrators. As we stated in Von Patzoll v. United States, 10 Cir., 163 F.2d 216, 220:

"The transportation of the intoxicating liquor from Dallas, Texas, to the point beyond Moore, Oklahoma, where the International Truck was seized, was a single transportation. Throughout the journey, the movement retained the character of interstate commerce. It continued to be a single transportation into Oklahoma. It, therefore, was a continuing offense. But where the transportation of intoxicating liquor into a state, in which all sales of intoxicating liquor are prohibited, reaches its intended destination in such state, * * * the offense is no longer a continuing one, and a subsequent transportation thereof within the state is not a transportation into such state."

■ The cessation of interstate transportation is not necessarily brought about because the modus of accomplishment is delayed or changed by unexpected circumstances and it continues as long as a singleness of purpose persists. Champlain Realty Co. v. Town of Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67

L.Ed. 309; United States v. One Durant Touring Car, D.C.Tex., 2 F.2d 478; United States v. One Packard Truck, 2 Cir., 55 F.2d 882, 883. In the latter case it is stated:

"Should prohibition agents come upon two trucks upon the road where one had broken down and its contents was being transferred to the other, we should not doubt that the driver of the second would be discovered 'in the act of transporting,' although his truck was stationary at the moment."

■ But a vehicle may not be condemned for unlawful use merely because there is an intended future purpose to transport liquor in it in violation of section 1262; the statute contemplates a present violation. Cf. Denton v. Flinchum, Okl., 285 P.2d 395.

■ And so, under the circumstances of the instant case, we deem the determinative question to be the intent and purpose then present in the minds of Jenkins and Akin when the liquor was transferred from the Ford to the Mercury. If, because the Ford car was both "hot" and disabled, the original intent to presently transport the liquor to Afton, Oklahoma, was abandoned in favor of storing or secreting the contraband in the Mercury at North Miami, Oklahoma, the liquor came to rest and the Mercury was not used in transportation. Just as the means of transporting liquor can be changed from the original plans so, too, can the destination. And when the destination is reached, the transportation ceases. Von Patzoll v. United States, supra. On the other hand, if the Mercury was loaded preparatory to moving it to another place and the transfer made as necessary for a continuation of the unlawful transportation to Afton or any other point of destination, then the Mercury became part of the importation scheme and was used in violation of the statutes.

The trial court at the conclusion of the case and in colloquy with counsel indicated a view as to what the fact was

relating to the intent and purpose of the transfer of the liquor from the Ford to the Mercury. But no finding was entered and we believe such to be necessary for a proper application of governing law. The judgment of the district court denying forfeiture is therefore vacated and the cause remanded for such determination and with instructions to enter judgment in accord with such factual determination and the views herein expressed.

**GIBSON-STEWART COMPANY, Inc.,**
**Appellant,**

v.

**WM. BROS BOILER AND MANUFAC-**
**TURING COMPANY, Appellee.**

**No. 13500.**

United States Court of Appeals
Sixth Circuit.

Feb. 19, 1959.

Howard E. Moore, Dallas, Tex.; Cecil L. Wood, Fort Worth, Tex., W. D. Cole of Kuth & Cole, Cleveland, Ohio, on the brief, for appellant.

Andrew E. Carlsen and Douglas L. Carlsen, Minneapolis, Minn.; John F. Oberlin of Oberlin & Limbach, Cleveland, Ohio, on the brief, for appellee.

Before ALLEN, Chief Judge, MARTIN, Circuit Judge, and GOURLEY, District Judge.

MARTIN, Circuit Judge.

In this suit for patent infringement, the able and experienced district judge held the four claims of Bros, et al., Patent (No. 2,610,557) to be valid and infringed by the appellant, Gibson-Stewart Company, Inc.

As stated by the patentee, the invention in the patent in suit relates to the art of compacting earth for roads, highways, airport runways, fills for dams, etc., where deep penetration and uniform but maximum density are important objectives and where the primary purpose is to provide a novel, efficient and practical pneumatic-tired compactor that will effectively, yet economically, meet these rigid objectives or requirements. The inventor stated that a typical exigency is presented by airport runways, which must receive and support aircraft weighing as much as three hundred thousand pounds. It was said further, in the patent application, that the resulting impact is such as to break down the runway pavement, unless properly constructed by base courses and sub-grades which have been compacted to an extremely high degree of density and to a depth of as much as five to six feet below the surface. The inventor then goes further to detail the specifications in the patent and makes four claims: all of which, as heretofore stated, were upheld by the district court.

Claim One is for an earth compaction roller comprising a hollow body member adapted to receive weight-producing ballast and having a transversely extending arched recess between its front and rear ends, an axially aligned series of pneumatic-tired wheels mounted in such recess to support the body member with its center of gravity substantially over the wheels, and a draft beam extending longitudinally through the lower part of the body, centrally thereof, such draft beam traversing the arch recess between two of such wheels and rigidly connecting opposite wall portions of the recess.

The other claims are in substance, as follows:

Claim Two. A unitary body structure having the central recess and employing two pairs of wheels—one of which is under each side—each pair being carried by the support beam additionally operating to maintain the lower ends of the recess wall in parallelism.

Claim Three is similarly limited to the use of four wheels and mountings in the recess; but this claim is directed specifically to the feature of arranging the four wheels so that they will carry equal loads and be spaced to produce equal compaction pressures in equally spaced paths.

Claim Four, in a general way, is similar to Claim Three; but it includes the parallelism-maintaining characteristic in addition to the wheel-spacing arrangement, which is specifically confined to an arrangement in which the space between any two wheels is less than the width of the tread of one wheel so as to prevent any substantial movement of earth upwardly between the tires.

The district judge received in evidence various exhibits revealing the prior art. He heard testimony of experts and other witnesses, analyzed the case and rendered an oral opinion, subsequently revised. He stated that "the defendant at the trial admitted infringement was present if the patent claims were valid."

On the issue of validity of the patent, the judge considered it more than a mere aggregation or assembly of well-known elements in the road-building art where densification of the ground is one of the principal accomplishments desired and compaction is another. He thought that the need for a marketable machine for compaction had been fulfilled by the appellee in a new and useful way, even though it had been necessary to use the prior art and structures to accomplish it. He considered that the problem solved by the inventor had been to bring together in a compact, efficient unit the necessary elements to meet a need by the use of means which would make the completed structure an easy on to manipulate, while accomplishing all that the old machines and structures had done. He stated that the arched recess is old and, standing alone, put nothing new into the combination of elements, being useful nevertheless. He said further that the oscillation and rocker-beam idea was not new and that the appellee did not even claim originality or novelty for most of

the elements embraced in the structure. But he well reasoned that novelty, usefulness and commercial acceptance for the manner in which the known elements were put together—not as a mere aggregation, but as a combination which accomplishes the job sought to be accomplished in a new and better way—was manifest.

The judge asserted that it had been conceded on the trial that the structure had met with commercial success which, had there been doubt about the validity of the patent, might have been sufficient to maintain validity. There was no doubt in the mind of the judge as to validity of the patent.

Judge Jones went into further discussion of the elements of the patent and concluded that the arrangement of the patented structure, distributing the load equally in all portions as it does, required more than ordinary mechanical and engineering skill for accomplishment. The distinguished jurist thought that, on the whole, the equalizing of the weight by the distribution of the wheels of the patent in suit and the recess part were not shown exactly by anything in the prior art. He considered the Browning structure in the prior art distinguishable, in that the load distributed to the two rollers—when taken apart—would not have been adequate to accomplish the purpose of the patent structure.

The judge reasoned that the spacing of the wheels themselves in Browning, although apparent in some structures, was staggered differently because they were alternating wheels, with the result that the whole area could be covered by two separate sets of wheels, one at one end of the structure and one at the other. He concluded that the arrangement of the patent in suit accomplished the purpose of bringing the whole load to bear uniformly on the sub-surface and effected in a more concise, compact way what had been attained previously by the staggered wheels.

Accordingly, a permanent injunction was issued against infringement by appellant of the patented structure; and the customary reference to a Master was ordered for an accounting to ascertain the profits and damages due by appellant to appellee. We are of opinion that the judgment of the district court should be affirmed.

■ Williams Manufacturing Co. v. United Shoe Machinery Corp., 6 Cir., 121 F.2d 273, 277, decided June 27, 1941, affirmed 316 U.S. 364, 365, 62 S.Ct. 1179, 86 L.Ed. 1537, was the first case at that time in which, for some fifteen years, the Supreme Court in an opinion had upheld the validity of a patent. In that case, Judge Simons, speaking for our court, said: "To the presumption of validity that attaches to a granted patent, where the most pertinent prior art has been cited against it in the patent office, there must probably now be added the force of a growing recognition of finality that is generally being accorded to administrative determinations supported by evidence, on the ground that the administrative agency is expected to have developed an expertness in its specific field beyond what may be expected from the courts wherein adjudications range the whole field of human controversies. It is true, of course, that in the most strict sense, the granting of a patent is not, except when an interference is declared, the result of an adversary proceeding, as in usual administrative determinations of agencies exercising quasi-judicial functions. Nevertheless, it wears, in the broader sense, an adversary aspect, since patent office examination protects the public against unmerited monopoly, and so the public, as represented by the examiner, is always impliedly in adversary position to the application just as it is ever a third party to an infringement suit. Kellogg Switchboard & Supply Co. v. Michigan Bell Telephone Co., 6 Cir., 99 F.2d 203. To the inferences in support of validity thus noted, must now be added the implication of correctness that attaches to the findings and conclusions of the District Judge who heard the testimony of the witnesses and saw the machines in operation." It was pointed out, more-

over, that an infringer who assails the validity of a patent, fair upon its face, bears a heavy burden of persuasion and fails unless his evidence has more than a dubious preponderance.

In Trabon Engineering Corporation v. Dirkes, 6 Cir., 136 F.2d 24, 27, Judge Simons gave expression to a principle directly pertinent in the present controversy. He stated that "long recognition of an existing problem in any art, and the advantages to accrue to an industry from its solution, have been considered as highly persuasive of invention when success is finally achieved; that sometimes achievement is revolutionary, but more often an inventor begins where others leave off, and perceives the vital forward step to which predecessors had been blind."

■ It is established, of course, that in a patent case the findings of fact of the district court—unless clearly erroneous—should not be disturbed. Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203, 207. This principle applies to issues of both validity and infringement.

■ Illustrative cases from this circuit, holding that a combination patent should not be invalidated by the mere fact that certain elements of the combination are old if invention inheres in the combination, are, among others: General Motors Corporation v. Swan Carburetor Co., 6 Cir., 88 F.2d 876, 887; International Visible Systems Corp. v. Remington-Rand, Inc., 6 Cir., 78 F.2d 606.

It would seem that the opinion of the Supreme Court in Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, is not applicable here because of the vast difference in the complexities of the two inventions. There, the condemned invention consisted simply in opening up the apex of the equivalent of an ordinary pool ball rack so that the legs of the triangle became parallel to each other and perpendicular to the base, the open rack being merely hand-

pushed along an elongated table in the handling of food sold in stores. The pushing element was not automatic—not even mechanical.

Here, as has been previously shown, the huge patented device was highly complicated and most ingeniously designed; and it served a purpose not theretofore known for practical requirements in its field.

Judge Allen has written for this court a carefully considered opinion in which are set forth several principles applicable to the instant case. Cold Metal Process Company v. Republic Steel Corp., 6 Cir., 233 F.2d 828. The opinion contains a wealth of citations of value to the patent bench and bar. To quote a few excerpts, the opinion stated [at pages 837, 838–839]: "The long-standing want and insistent demand satisfied by the patentee demonstrate the existence of invention. Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721; Watson v. Heil, 4 Cir., 192 F.2d 982, 985, * * * In order to secure a true and patentable combination of old elements, the elements must co-act to produce the result achieved, the result must be new and useful, and the method of operation must be new. Great Lakes Equipment Co. v. Fluid Systems, Inc., 6 Cir., 217 F.2d 613, 617. If the method of operation is new and the result is new, the old elements perform a new function in their new environment." The opinion stated also [233 F.2d at page 837]: "The best of the art relied on here [as in the instant case] was before the Patent Office and this fact strengthens the presumption of validity. Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203, 205, certiorari denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030."

■ As we think has been hereinbefore indicated, the trial judge made an adequate, succinct and accurate statement of the reasons for which the claims of the patent were considered valid. There was ample basis in the testimony of expert witnesses to support his deductions. In the light of the record, we think it

would be an all too sweeping and incorrect generalization to say that the subject matter of the patent in suit would be obvious to those schooled in the art at the time the invention was disclosed. We think the objective was attained by the claims of the patent to provide a pneumatic-tired roller, so constructed and of such weight as to produce compaction of sufficient magnitude to bring about deeper penetration and more intense densification than had been accomplished before, without the sacrifice of rigidity of body or maneuverability. The roller was also kept within the limitation of ground area.

Upon careful analysis, the claims of the patent in suit seem to present a distinctive inventive concept which had no equivalency in the prior art. We think that neither the oscillating wheels of Grace, nor the body in Browning, nor Porter's wheel-spacing represents anticipation of the combination patent in suit.

Accordingly, for the reasons set forth in this opinion and in that of the United States District Judge as herein analyzed, the judgment of the district court is affirmed.

* This act in its present form is found in the General Statutes of North Carolina, Chapter 115, Article 21, Secs. 115–176 to 115–179. Changes of assignment are regulated by Sec. 115–178.