**William H. HARVEY et al., Plaintiffs,**

v.

**Roy LEVINE et al., Defendants.**

**No. 35255.**

United States District Court
N. D. Ohio, E. D.

Feb. 13, 1962.

See also 25 F.R.D. 15.

George Knowles, Fred J. Samerdyke, Bosworth, Sessions, Herrstron & Knowles, Cleveland, Ohio, for plaintiff.

William C. McCoy, Sr., William C. McCoy, Jr., McCoy, Green & TeGrotenhuis, Edward J. Schweid, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

Plaintiff, Paul E. Thies, of Nebraska, is the patentee.[1] Prior to 1953 Thies had been a journeyman plumber, a master plumber and proprietor of a plumbing, heating and electrical contracting business. He also had experience as a salesman for The Capital Supply Company, of Lincoln, Nebraska. Plaintiff William

Harvey is the exclusive licensee for the United States of the Thies patent, with the right to grant sublicenses and to participate in infringement actions. Harvey also had experience as a journeyman and master plumber, and was in the plumbing contracting business in Omaha, Nebraska prior to 1945, at which time he pioneered in the development and sale of wax ring sealing gaskets for toilet bowls. In 1959 The Wm. H. Harvey Company, a corporation, was organized. A sub-license under the Thies patent was granted to the corporation, which continued the manufacture and sale of the device described in the patent in suit. By stipulation and order following a pretrial conference, the corporation was made a party plaintiff. Defendants, Roy Levine and Henry Feniger, as partners, were engaged in selling, among other things, sealing gaskets. The partnership did business under the name of Beacon Manufacturing Company, The Wax Products Company, and other fictitious names. In July 1959 The Beacon Manufacturing Company, a corporation was organized, and in February 1960 Levine and Feniger transferred some, if not all, of their partnership assets and business to the corporation. The corporation continued in the manufacture and sale of the accused sleeve gaskets. By stipulation of the parties and order of the court this corporation was made a party defendant. Plaintiffs seek an accounting, damages, injunctive relief and costs. Defendants deny the validity of the patent and, if the patent be held valid, they deny infringement. Defendants also assert the defense of plaintiffs' alleged misuse of the patent.

The patent in suit describes "a bowl sleeve gasket," the purpose of which "is to prevent dampness in floor areas around toilet bowls and thereby eliminate rotting or decaying of wood and other flooring materials around toilet bowls." The invention contemplates—

"a ring gasket of wax, sponge rubber, or other similar material, and a

1. Patent No. 2,750,216. Application filed December 3, 1953; Patent issued June 12, 1956.

depending sleeve or skirt, the diameter of the lower end of which is less than that of the upper end, extended downwardly from the inner surface of the ring and having a flange on the upper end extended into the material of the ring." (Pat.Col. 1, lines 45–50)

"The object of this invention is, therefore, to provide a sealing gasket adapted to be positioned between the outlet opening of a toilet bowl and a nipple extended upwardly from soil pipe whereby the possibility of leakage between the parts is reduced to a minimum." (Pat.Col. 1, lines 51–55)

"Another important object of the invention is to provide an improved gasket for sealing the connection between a toilet bowl and a drain or soil pipe below the bowl in which the gasket is adapted to be installed by the average artisan." (Pat.Col. 1, lines 59–64.)

Other objects of the invention appear in the Specifications.

■■ The patent covers the combination of two elements, viz. a ring gasket of wax, sponge rubber or other similar material and a depending sleeve extending downwardly from the inner surface of the ring. Both of the above elements are old in the art. The ring gasket of the patented device is made of wax. Ring wax gaskets have been in use in this country since they were first made and sold by plaintiff, William H. Harvey, in 1945. The patent does not specify any particular material for the sleeve, and until January 1956 Thies manufactured and installed a lead sleeve in the patented device. Thereafter he made a sleeve of molded polyethylene and has continued to use sleeves made of this plastic material. The accused device also has a wax ring gasket and a polyethylene sleeve. These plastic sleeves, being much lighter in weight than those of lead, have many advantages not possessed by the latter, including lesser cost of material and lower freight charges. The prior art references submitted by defendant consist of the LeTarte patent No. 2,082,348, Freedlander No. 2,153,664 and Douglas No 1, 358,714. LeTarte provides for a seal consisting only of a sponge rubber ring gasket, no reference being made to a sleeve. Obviously that reference does not anticipate nor does Freedlander, which relates to a gasket and strainer, the latter being a cup-shaped screen member of metal work. Freedlander is in a remote art described by plaintiffs' expert as "Class 210 Liquid Purification or Separation, Sub-class 164, in a Pipe Line." Douglas is the best of defendants' references. Mr. Sessions, defendants' expert, considered this reference to be pertinent because "It shows a sleeve extending downwardly from a short horn toilet bowl." Sessions conceded, however, that Douglas disclosed no sealing gasket between the sleeve or flange (14) and the toilet bowl. He also conceded that four leakage paths were shown in the reference. Sessions expressed the opinion that after the advent of the wax ring it would be apparent that the use of the wax rings in Douglas would provide an effective seal. He acknowledged, however, that there was no disclosure in Douglas that taught or suggested the placing of any sealing material between the sleeve or flange (14) and the toilet bowl or between the trough and the upper end of the lead bend. Douglas includes a water seal and a seal of mercury deposited on top of the water. Douglas does not anticipate the patent in suit. Defendants also cite and rely upon Auer No. 1,333,368, which was cited by the Patent Office against the Thies application. Defendants complain specifically that the Patent Office did not give Auer "proper consideration." There is no evidence supporting such contention. On the contrary, it appears affirmatively that adequate consideration was given to this reference during the prosecution of the Thies application. Defendants' real contention seems to be that the Patent Office was mistaken in its evaluation of Auer, vis-a-vis, the Thies application. As is well known, a grant carries with it a presumption that the

patent is valid. This presumption rests upon the recognized expertise of the Patent Office and its duty to protect the public from unmerited monopolies. Williams Mfg. Co. v. United Shoe Mach. Corp., 121 F.2d 273, 277 (6th Cir.), aff'd. 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; Gibson-Stewart Co., Inc. v. William Brothers Boiler & Mfg. Co., 6 Cir., 264 F.2d 776. Of course the presumption of validity is not conclusive and may be overcome by evidence demonstrating error in the Patent Office's determination that the cited prior art did not anticipate. Auer shows a separate sleeve at the bottom of the toilet bowl horn with a flange sandwiched between two separate pliable sealing rings clamped between the toilet bowl and the floor and is patentably distinguishable from the patent in suit.

■■ No single reference anticipates the patent in suit but, as was said in Allied Wheel Products v. Rude, 6 Cir., 206 F.2d 752, 760: "To anticipate an invention is to negative novelty; but even though a patent is not anticipated, and is concededly novel, it may lack invention." In considering whether the patented device amounts to invention or is the result of mechanical skill the entire pertinent art must be taken into account. The desirability and need of a tightly sealed connection between a toilet bowl and a soil pipe thereunder has long been recognized. Such recognition has been evidenced in the patents mentioned above. There is no showing, however, that either of the devices covered by the prior art patents of Auer and Douglas were used commercially. It is impossible, therefore, to determine whether they failed or succeeded in meeting the need. From time to time unpatented means, such as the use of seals made of plaster, putty and other materials, were adopted with varying degrees of success. The introduction of the wax ring gasket in 1945 marked the advent of the most effective and successful seal in the art to that time. The wax ring gasket met with great success throughout the country. Witnesses for the defendants testified that the seal effected by such a gasket is as efficient as a seal made pursuant to the teaching of the patent in suit. An object of the patent in suit is to provide an improved sealing gasket " * * * of simple and economical construction." Without conceding that such object has been achieved, defendants contend that any advance in the art due to the Thies patented device is the result solely of mechanical skill. It is a familiar rule that if an applicant with the prior art before him could make the patented structure without the exercise of the inventive faculty, the patent is invalid. Sec. 103, T. 35, U.S.C.A., which defines the test of obviousness, provides that a patent may not be obtained " * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

The subject matter of the Thies patent is described in Claim No. 1 of the patent as follows:

"1. In a sealing gasket for a toilet bowl, the combination which comprises a ring of pliable material, said ring being rectangular shaped in cross section and having an annular slot in the inner surface, a sleeve positioned with the upper part nested against the inner surface of the ring and having an inwardly offset lower part providing a skirt, the diameter of which is less than that of the upper part, and a flange extended from the upper end of the sleeve and positioned in the slot of the ring."

Claim No. 2 appears in the margin.[2]

2. MARGINAL NOTE—CLAIM NO. 2 OF THIES

"2. In a gasket for sealing the connection between a toilet bowl and soil pipe below the bowl, the combination which comprises a ring, rectangular shaped in cross section and having an annular slot extended from the inner surface into the body of the ring, the slot being positioned substantially midway of the height of the

The prior art includes the Auer, Douglas and LeTarte patents, the unpatented wax ring gasket introduced to the trade by Harvey in 1945, the Cain patent, No. 469,830, cited by the Patent Office, and Freedlander No. 2,153,664 cited by defendants. The last two references are from non-analogous arts. Cain describes an improvement of an airbrake hose coupling which relates specifically to the construction of annular rubber gaskets and the manner in which they are secured to the coupling shells. In fitting the gasket to the coupling shell the arms of the metal ring are sprung within the flange so that the edge of the rubber gasket shall be set against the flange and the periphery of said gasket shall fit within the wall of the opening. (Pat.Col. 2, lines 54–60) By granting the Thies application the Patent Office held in effect that Cain, considered with other references, did not anticipate and it is plain that as so considered it does not negative invention. Freedlander shows a combined gasket and strainer in which an annular gasket of rubber or other resilient material performs the function of supporting and locating a cup-shaped strainer of metal mesh used in the purification of liquids, such as gasoline. In so far as the gasket in Freedlander supports and positions another member of the combination it performs a function similar to that of the gasket of the patent in suit. Defendants argue that Freedlander is therefore a more pertinent reference than Cain. Freedlander has no slot in the gasket and does not deal with a problem similar to that solved by Thies. In Freedlander the periphery of the strainer extends completely through the rubber gasket. Such a condition in the Thies gasket would provide additional leakage paths and tend to defeat the primary object of the patented device. Moreover, a person skilled in the art of sealing toilet bowl connections could hardly be expected to be familiar with the remote and non-analogous art in which Freedlander is found. As was said in Allied Wheel Products Co. v. Rude, supra, at 755:

> "though an inventor is conclusively presumed to know the prior art in his own and clearly allied lines of endeavor, he is not bound by what has been done in remote or non-analogous arts. Ottinger v. Ferro Stamping & Mfg. Co., 6 Cir., 59 F.2d 640; Alemite Mfg. Corp. v. Rogers Products Co., Inc., 3 Cir., 42 F.2d 648."

It is a safe assumption that Thies derived no inspiration from Freedlander, and I hold that this reference is not pertinent.

LeTarte sheds no light on the issue of invention. As already shown, the devices covered by Auer and Douglas are complicated structures which apparently were not used commercially. Auer is significant on the issue of invention because of the "nipple (sleeve) which extends at its lower end into the upper edge of the soil pipe * * *." Douglas is significant because it shows a short horn bowl with a sleeve extension. But by far the most significant item in the prior art on the issue of invention is the unpatented wax ring gasket which had been in public use for eight years prior to the application for the Thies patent. Plaintiffs concede that a workman of ordinary skill in the art with the wax ring gasket and the prior art patents of Auer, Douglas and LeTarte before him might readily and broadly conceive a combination of a wax ring gasket and sleeve. Such a combination generally is suggested by the prior art. Plaintiffs con-

ring and the upper inner edge of the ring above the slot being relieved providing an arcuate surface, and a sleeve positioned with the upper part nested against the inner surface of the ring and with an annular flange extended from the upper end embedded in the slot of the ring, said sleeve having an inwardly offset sec- tion spaced below the ring providing a depending skirt, the diameter of which is less than that of the upper part of the sleeve whereby with the sleeve positioned in a tube with the ring on the upper end of the tube, the skirt is spaced from the wall of the tube."

tend, however, that the precise combination of the Thies invention would not have been obvious to a mechanic of ordinary skill in the art at the time the invention was made. This latter contention is sound. Considered separately or in any of the several available combinations, the prior art patents do not suggest or foreshadow the unique unitary structure of the patent in suit. It does not appear that the wax ring gasket was before the Examiner during the prosecution of the Thies application or that the Examiner knew of the eight years of prior public use of that device. The wax ring gasket did not anticipate but it did serve to limit and render more difficult the selection of means by which it could be usefully combined with a sleeve. The means adopted by Thies included, inter alia, the novel expedient of an annular slot in the inner surface of the ring into which is imbedded the flanged upper end of the sleeve. At the time the invention was made the unique arrangement of the unitary patented structure would not have been obvious to a mechanic of ordinary skill in the art. Nor can it be said that such a mechanic with the prior art before him could have made the patented structure without the exercise of the inventive faculty.

In contesting the validity of the patent, defendants rely most strongly on the stringent test laid down in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. In that case the Supreme Court admonished the lower courts as follows:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. * * * "

Announcing the exacting standard applicable in cases involving the patentability of combinations of old elements, the court said:

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test.

"Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it."

██ Defendants cite the following Sixth Circuit Court of Appeals cases applying the principles laid down in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra: General Motors Corp. v. Estate Stove Co. et al., 6 Cir., 201 F.2d 645; General Motors v. Estate Stove Co. et al., (on rehearing) 6 Cir., 203 F.2d 912, 917 (1953); Allied Wheel Products v. Rude, 6 Cir., 206 F.2d 752, 762 (1953); Buffalo-Springfield Roller Co. v. Galion Ironworks Mfg. Co., 6 Cir., 215 F.2d 686–688; Bede et al. v. Baker & English, Inc., 6 Cir., 274 F.2d 833–840. All of the cited cases except Bede et al. v. Baker & English, Inc., supra, were decided in the district courts before the effective date of the 1952 Patent Act. With the exception noted, none of the cited cases were governed by the new Act either at the original trial or upon review. Plaintiffs contend that the new Patent Act modified the rigorous implications of Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. A similar argument was addressed to the Sixth Circuit Court of Appeals in General Motors v. Estate Stove, Co., supra (on rehearing). After conceding "that the new Act does not apply to our adjudication of this case" the Court of Appeals said:

"We are, however, of the view that the principle stated in the Great At-

lantic & Pacific Tea Co. case is not modified by the new Act, but continues to be the law and is here controlling."

Obviously the latter statement of the Court is dictum. However, unless it represents a view since repudiated by the Sixth Circuit Court of Appeals, it must be accorded great weight by this Court. Plaintiffs assert that in Cold Metal Process Co. v. Republic Steel Corp., 233 F. 2d 828 (6th Cir. 1956) the court did not follow its dictum in General Motors v. Estate Stove Co., supra, but applied the law as set forth in Section 103 of the new Patent Act. It is true that in Cold Metal Process the court, inter alia, applied the test of obviousness laid down in Section 103 of Title 35, but there is nothing in the opinion of that case inconsistent with a strict construction of Great Atlantic & Pacific Tea Co., supra. In commenting upon the Roller Bearing argument of the defendant in Cold Metal Process Co. v. Republic Steel Corp., supra, the court said:

"A roller bearing will always be a roller bearing. A mechanism used in a combination is not thereby transformed into a different mechanism. However, when it is installed in a new environment, it performs a new function if the operation is new and the result is new. Here the roller bearing was installed in a new environment where it had room to function, where its size was adequate to the greatly increased loads, and *the results revolutionized the industry.* In order to secure a true and patentable combination of old elements, the elements must co-act to produce the result achieved, the result must be new and useful, and the method of operation must be new." (Emphasis supplied.)

Results that "revolutionized the industry" certainly met the "rather severe test of "unusual or surprising consequences" laid down in Great Atlantic & Pacific Tea Company. Plaintiffs also cite National Latex Products Co. v. Sun Rubber, 274 F.2d 224, 239, 242 (6th Cir.) as showing

a disposition of the Sixth Circuit to modify its views on the effect of Great Atlantic & Pacific Tea Company considered in the light of the new Patent Act. In National Latex the court held:

"Although the elements are old, no prior machine has attained *the spectacular results* in speed and efficiency of mass production in this art attained by this machine." (Emphasis supplied)

Here again is an instance where the test of "unusual or surprising consequences" was met. In Bede v. Baker & English, Inc., 6 Cir., 274 F.2d 833, 840, however, the court referred to its opinion in General Motors v. Estate Stove Co., 6 Cir., 201 F.2d 645, in which it quoted extensively from Great Atlantic & Pacific Tea Company and in summarizing its reasons for holding the patent invalid said:

"Since the elements of appellants' patent in suit were old elements partaking of the prior art; since they performed no additional or different function in the combination than they performed outside of it; and since the case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, it follows the combination of the elements of the patent in suit resulted only in a nonpatentable aggregation, and does not constitute invention." (274 F.2d p. 840)

The foregoing review affords little support for the opinion that the Sixth Circuit Court of Appeals has modified its view in respect of the controlling effect of Great Atlantic & Pacific Tea Company in cases involving combinations of old elements. In Gibson-Stewart Co. v. Wm. Bros Boiler & Mfg. Co., 264 F.2d 776, 779, the Sixth Circuit refused to follow Great Atlantic & Pacific Tea Company because there was a vast difference between the complex invention in the case before it and the simple apparatus condemned in Great Atlantic & Pacific Tea Company. I do not consider the last cited case applicable here.

Defendants contend that the elements in Thies perform no additional or different function in the combination than they perform out of it and for that reason the patent is invalid. The evidence is to the contrary. In addition to performing the function of providing a seal, the wax ring gasket performs the function of holding and positioning the sleeve. The sleeve is integrated with the gasket in a unitary structure in which the elements co-act to produce a substantially improved and more efficient seal. Among the advantages shown by the evidence are: (1) The elements of the device co-act to facilitate the installation of the device and the alignment of the horn of the bowl with the waste pipe; the ring gasket is readily mounted on the horn with the bowl upside down and holds itself and the sleeve on the bottom of the bowl when the bowl is turned right side up, centered above the waste pipe and lowered into position. (2) The sleeve projects as a pilot and aids the person making the installation in centering the bowl in relation to the waste pipe. The lower part of the sleeve is easily inserted into the waste pipe and when this is accomplished it constitutes a signal to the plumber, who cannot see either the horn or the waste pipe, that these elements are in alignment. Thus the waste pipe is more readily and effectively aligned with the horn when the patented device is used than when a sleeveless wax gasket is used. (3) The sleeve constitutes a bridge across the joint between the horn of the bowl and the inlet end of the waste pipe. In recent years short horn bowls have supplanted long horn bowls to a considerable extent. Difficulties have been encountered in placing short horns within the waste pipe. The sleeve, however, serves as an extension of the short horn and is effective to introduce the horn into the waste pipe even in those cases where the horn is unusually short or where its lower edge is chipped or irregular. When held in place and sealed to both horn and waste pipe by the wax ring the sleeve functions to conduct the effluent received from the horn down past the joint, thus preventing the liquid from traveling anywhere except in the desired path downwardly through the waste pipe. The effluent being discharged from the toilet bowl is centered and can not flow against the inner surfaces of the waste pipe until it is below the joint. (4) As a witness for the plaintiff, Professor Pettijohn said that when the plain sleeveless wax ring gasket was used the force of the swirling sideway discharge of effluent would deform the exposed wax and cause it to be washed away. Mr. Dimock, the expert for the defendants, testified that the wax could not be washed away. However, a photograph in evidence (Ex. 45–C), which was identified by the patentee, shows clearly that on an occasion when the sleeveless gasket was used wax was washed away from the horn "breaking the seal." Thies also testified that "misalignment was a contributing factor to this condition." The erosion of wax shown by Exhibit 45–C occurred in Nebraska where modern improved methods of installing closet bowls such as are used in Cleveland, Ohio and other large municipalities are not employed. It is reasonably to be inferred that erosion of exposed wax is more likely to occur when sleeveless gaskets are used in those parts of the country where modern methods of installation have not been adopted. It seems probable, therefore, from time to time there will be eroding and washing away of exposed wax when sleeveless gaskets are used to seal the joint. This cannot happen if the patented structure is used. The sleeve of the patented device prevents the eroding and deforming of the sealing material by conducting the flowing effluent downwardly beyond and away from the wax of the ring. The bottom portion of the wax ring which seals against the floor flange of the waste pipe is shielded by the sleeve against the impingement of discharging liquid against or into this bottom seal. The sleeve also carries fluid downwardly past any holes, cracks or other defects in the upper portion of the waste pipe. (5) The wax ring and the sleeve co-operate to form seals between the ring and

the toilet bowl, between the ring and the soil pipe, between the ring and the sleeve. The constituent elements of the patented structure are so arranged as to provide in a single gasket sufficient wax to effect all necessary seals, including the new one between the ring and the sleeve.

Plaintiffs contend that the patented device has a longer life than the sleeveless wax gasket. Sufficient time has not elapsed to determine from experience whether this is so and plaintiffs have offered no proof supporting their contention. Defendants point out that in his application for a patent on the sleeveless wax gasket Harvey stated that the gasket "made a tight permanent setting" and also characterized the wax as "an undeteriorating material" which "would last many many years" and that Professor Pettijohn described the wax material as "permanent." It is urged that these statements indicate a long life for an effectively functioning sleeveless gasket. If this be true, it would seem logically to follow that the improved patented sleeve gasket which uses the same wax would have an equal if not longer life than the sleeveless gasket. Argument, however, is no substitute for evidence. In the absence of proof bearing directly upon the comparative lasting qualities of the patented structure and the sleeveless gasket no definitive finding can be made on this issue. It is interesting to note that in their advertising matter the defendants assert that their infringing Sure-Fit device "keeps all floor type bowls permanently sealed" and "permanently sealed against water * * *." It can be asserted confidently that a seal achieved by the patented structure will endure as long as one effected by the accused device.

The test of patentability under Great Atlantic & Pacific Tea Co. is whether the unification of old elements produces unusual or surprising consequences. The Supreme Court indicated in the cited case that it is not the usual result of uniting elements old in mechanics that they "take on some new quality or function." In the case at bar the unification has resulted in a unitary structure in which the wax gasket in addition to serving as a seal also performs the function of holding and positioning the sleeve. This new and additional function of the gasket "not being the usual result of uniting elements old in mechanics" must be deemed an unusual result of the unification. In a real sense also the sleeve of the patented device took on a new and additional quality and function upon being integrated with the wax ring gasket.

Unlike the sleeves of the earlier patents the sleeve of the patent in suit was designed and positioned to secure joint action with the wax gasket in facilitating the installation of the device and assisting in effectuating a true alignment of the horn of the bowl with the waste pipe. Thus, both the gasket and sleeve perform additional and different functions in the combination than they perform out of it. The co-action of these elements resulted in producing the most effective seal in the art. The co-operation of the gasket and sleeve produced the advantages hereinabove enumerated which include the unusual and surprising results of simplifying the formerly difficult method of installation and of providing a proper alignment of horn and waste pipe. A further unusual result of the combination is the success of the sealed and vertically centered sleeve in preventing the effluent received from the horn from flowing against the inner surfaces of the waste pipe until the liquid is well below the joint. This is due in part to the reduced diameter of the lower end of the sleeve which is spaced inwardly from the wall of the waste pipe. A further unusual consequence of the unification is that the bottom portion of the wax ring which seals against the floor flange is shielded by the sleeve against the impingement of discharging liquid into or against this bottom seal.

The patented structure is no mere aggregation of old elements performing no new or different function than that theretofore performed by them. Lincoln Eng. Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed.

1008. The patented device is a true combination of old elements brought together in a unique unitary arrangement which includes the hitherto unknown and novel expedient of an annular slot in the ring into which the flanged upper end of the sleeve is inserted. It required more than mechanical skill to conceive and effectuate this arrangement.

In the recent case of Application of Wright, 268 F.2d 757, 46 C.C.P.A. 955 (1959) U. S. Court Customs and Patent Appeals said:

> " 'Though the court may have believed that each of the elements in the patented device was old, it does not follow that the combination was unpatentable. We need not elaborate upon the rule that a novel combination of old elements which so cooperate with each other so as to produce a new and useful result or a substantial increase in efficiency, is patentable. See Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, certiorari denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605; Blaw-Knox Co. v. I. D. Lain Co., 7 Cir., 230 F.2d 373.' Weller Manufacturing Co. v. Wen Products, Inc., 7 Cir. 1956, 231 F.2d 795, 798."

There can be no doubt that the patent in suit produces a substantial increase in efficiency. In the frequently cited case of Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 432, 38 S.Ct. 547, 62 L.Ed. 1196, it was said:

> "Generally speaking, a combination of old elements in order to be patentable must produce by their joint action a novel and useful result, or an old result in a more advantageous way."

Here the combination produces "a novel and useful result." However, if it be considered that the combination produces an old result it must be recognized that this is accomplished "in a more advantageous way." The public has given its tribute to the patented device. The invention has achieved substantial commercial success.

In the first year of production, when Harvey was making the devices for Thies, production amounted to 7,484 units. In the same situation, in 1955 production increased to 15,914 units. In 1956 production was 48,492. In 1957 Harvey operated as sole license and the annual sales thereafter were:

$$
\begin{array}{ll}
1957 & - 190,475 \\
1958 & - 262,153 \\
1959 & - 278,519 \\
1960 & - 327,868
\end{array}
$$

Thus, in 7 years more than a million patented structures have been sold. This result was achieved largely on the merit of the product, the amount spent for advertising during the above period was only about $5,000.00. The patented device, however, has not displaced the sleeveless gasket which continues in heavy demand, the sales of that device being in excess of one million units annually. The patented device sells at a higher price than the sleeveless gasket. In view of this, the growing acceptance by the trade of the patented device is significant. Defendants have paid the patented device the tribute of imitation. Commercial success is not a substitute for invention and is not submitted as such here. But it is a factor that cannot be ignored. As Circuit Judge Alschuler sagely observed:

> "In most instances, the judgments of those who pay their money to secure the benefits of the patented article is truer and better than the opinion of experts or the speculations of an arbitrator." Wahl Clipper Corp. v. Andis Clipper Co. et al., 7 Cir., 66 F.2d 162.

Marked commercial success is entitled to weight and should in a close case tip the scales in favor of patentability. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721.

Defendants have not sustained the burden of overthrowing the statutory presumption of validity of the patent. Because of this and for the other reasons hereinabove assigned I hold both claims of the patent to be valid.

## INFRINGEMENT

The patented device was brought to the attention of defendants by one of their men in the field shortly after it was placed on the market. Defendants examined a copy of the patent in suit in the Cleveland Public Library within a few months after its issuance. Almost a year later, in June 1957, defendants consulted a patent attorney but no search of the art was made until after April 1959—more than a year after defendants commenced production of their Sure-Fit sleeve gasket. Defendants relied on the opinion of their patent attorney that the Thies patent was invalid. However, before commencing the manufacture of the sleeve gasket defendants made a number of sleeves of different designs which apparently were found unsatisfactory by the plumbers and plumbing supply dealers to whom they were submitted. Defendants then had a drawing made by Ambrose Ginsberg, an engineer with the National Aeronautics & Space Administration, and a brother-in-law of defendant Levine. It was conceded that Ginsberg probably was shown a device manufactured by plaintiffs before he made his drawing. Ginsberg's design is similar to the sleeve of Figure 1 of the patent and also similar to the sleeve part of plaintiffs' device as exemplified by physical Exhibit 14. The Ginsberg design was submitted to Carlon Products for the purpose of molding sleeves in conformity therewith. This design was not accepted by Carlon who proposed instead the design shown in Exhibit 54, which is closer to the design of the patent. Defendant Feniger conceded that at the time he discussed the matter with Carlon he could have had one of plaintiffs' sleeve gaskets with him. Sleeves were manufactured in conformity to the design proposed by Carlon and incorporated in defendants' accused device.

The foregoing illustrates defendants' efforts to contrive an independent design but, as plaintiffs assert, "they were compelled to copy the sleeve design shown in the patent with slavish exactitude."

The disinterested expert witnesses on either side are in disagreement on the question whether the accused device is within the scope of the claims of the patent in suit. A visual examination and comparison of the physical exhibits of defendants' device with those of plaintiffs' tend to support the view of plaintiffs' expert. There are variations depthwise in the location of the flange of the sleeve in the wax gasket body of some of defendants' devices as compared with others manufactured by them. It was shown that in plaintiffs' physical Exhibit No. 8 and photographic Exhibits 25, 26, 27 and 63 that the flange of the sleeve of the accused device was relatively close to the top or beveled edge surface of the gasket while in other samples of defendants' device the flange of the sleeve is relatively close to the flat bottom surface of the wax gasket. These variations were not the result of design but were caused by the various hand-assembly methods of defendants. In the manufacture of the accused device hot molten wax is first poured into molds and sleeves are then placed in the wax by hand. If the sleeve is placed in relatively hot fluid wax it will sink rather deeply into the wax whereas if it is not placed in the wax until the latter is relatively cold the sleeve will be supported by the wax close to the surface. These are relatively minor variations. Minor structural variations or the substitution of mechanical equivalents do not avoid infringement of a combination. Jeoffroy Mfg. Co. v. Graham, 206 F.2d 772 (5th Cir.) Defendants take the position that because in their Sure-Fit device there is a portion of excess wax inside the sleeve that this avoids infringement. Excess wax inside the sleeve also appears in plaintiffs' device. This excess results from molten wax flowing into a clearance provided between the sleeve and the center of the mold for the escape of air that would otherwise be trapped under the sleeve flange and form objectionable bubbles in the wax ring. It appears that the excess wax in the accused structure results from similar manufacturing proce-

dures of defendants. In neither the patented or accused device is such excess wax essential to a proper functioning of the devices. During the trial Thies demonstrated by a simple slicing operation that such excess wax is easily removed. Such an operation could be performed at the time of manufacture on each device in which there was excess wax or a different manufacturing procedure could be adopted which would prevent formation of such excess. The adoption of either of these procedures would, of course, increase manufacturing costs. Since the excess wax causes no substantial change in the structure, functions or results of the patented combination, plaintiffs elected to employ the more economical method of manufacture. It appears that defendants have adopted a similar policy. Plaintiffs do not disagree with defendants' contention that wax on the inside of the sleeve gasket assists in centering the gasket when it is placed on a bowl prior to installation. However, it is the settled law of the Sixth Circuit that—

"Addition of new element does not avoid infringement, even if added element be regarded as an improvement of patented device." Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 76 F.2d 653; Farrington v. Haywood, 6 Cir., 35 F.2d 628; Stubnitz-Greene Spring Corp. v. Fort Pitt Bedding Co., 110 F.2d 192 (6th Cir.); Holland Co. v. American Steel Foundries, 190 F.2d 37 (7th Cir.); Aluminum Co. of America v. Thompson Products, 122 F.2d 796 (6th Cir.); Kelley-Koett v. McEuen, 130 F.2d 488 (6th Cir.).

It may be added that—

"One does not escape infringement by practicing invention imperfectly." Kansas City Southern Ry. Co. v. Silica Products Co., 8 Cir., 48 F.2d 503, 508.

Defendants argue that neither the devices manufactured and sold by the defendants or those manufactured and sold by plaintiffs are within the claims of the Thies patent. It is urged that neither device has "an annular slot in the inner surface of the wax ring with the sleeve positioned with the upper part nested against the inner surface of the ring and a flange extended from the upper end of the sleeve and positioned in the slot in the ring." As related to the device manufactured and sold by defendants, the above contention is irrelevant. It is axiomatic that infringement depends not upon what is manufactured or sold by the patentee but upon what he has patented. Walker on Patents, Deller Ed., Vol. 3, p. 1681, ¶ 450, and cases there cited. In so far as the foregoing contention relates to the accused device it is not supported by the evidence. Visual examination of the physical specimen of the accused device together with the drawings and photographs in evidence show that in relation to the patented structure the accused device performs substantially the same function in substantially the same way to obtain the same result. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 43, 50 S.Ct. 9, 74 L.Ed. 147. Compare: Great Lakes Equipment Co. v. Fluid Systems, Inc., 217 F.2d 613 (6th Cir.).

I hold that the accused device infringes the patented combination.

## PATENT MISUSE

There is no merit in defendants' claim that plaintiffs misused the patent. The alleged misuse is based upon the following paragraph of the license agreement between Thies and Harvey:

"7. Licensee agrees that he will not manufacture or sell any article of equipment similar in nature to the Bowl Sleeve Gasket patented by Licensor without first having the written consent of the Licensor, and it is agreed that the meaning of 'similar in nature' as employed in this paragraph is any kind of a bowl sleeve gasket which has a skirt which extends from the gasket downwardly during use, and into a soil pipe for preventing leakage of debris and odors from the soil pipe past

said gasket adjacent the floor on which said gasket rests."

It was urged that the foregoing provision illegally extended the scope of the patent monopoly, and, on the authority of National Lockwasher Co. v. Geo. K. Garrett Co., 3 Cir., 137 F.2d 255, constitutes a misuse of the patent. By amendment to the license the above provision was canceled on December 12, 1958 prior to the commencement of this action. The evidence is clear that prior to its cancellation the above paragraph was not enforced. Misuse of a patent does not invalidate the grant. It merely disqualifies the owner or licensee of the patent from maintaining an action for infringement until it has been shown that the improper practice has been abandoned. Here there is no evidence of misuse. Even if the above provision were improper, its cancellation before suit qualifies the plaintiffs to maintain this action. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis et al., 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367.

Plaintiffs are entitled to an injunction and an accounting.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A.

An order may be prepared in accordance with the foregoing.