COAL PROCESSING EQUIPMENT, INC., Plaintiff,

v.

Bobby C. CAMPBELL, Defendant.

No. C–1–78–0161.

United States District Court, S.D. Ohio, W.D.

Aug. 7, 1981.

Donald M. Lerner, Cincinnati, Ohio, Harvey B. Jacobson, Jr., Washington, D.C., for plaintiff.

Lawrence A. Johnson, Tulsa, Okl., Frank J. Thermes, Dayton, Ohio, William S. Dorman, Tulsa, Okl., for defendant.

## OPINION

DAVID S. PORTER, Senior District Judge:

### PROCEDURAL POSTURE

This action concerns United States Patent No. 3,926,787 [the "Gay patent"], now owned by defendant Bobby C. Campbell. Plaintiff Coal Processing Equipment, Inc. ["CPE"] filed this action on March 24, 1978, asking in its complaint (doc. 1) for a declaratory judgment that the Gay patent is invalid and uninfringed, for damages on a claim of common law unfair competition, and for attorney fees pursuant to 35 U.S.C. § 285. Along with its complaint CPE filed a petition for a temporary order (doc. 2) enjoining Campbell from interfering with CPE's business activities, and from filing an infringement action based on the Gay patent. A consent order (doc. 3) enjoining Campbell from interfering with CPE's customer relations and from filing a separate infringement action was filed April 7, 1978. On May 4, 1978 Campbell filed an answer denying the substance of CPE's complaint and entered a counterclaim alleging devices manufactured and sold by CPE infringed the Gay patent.

Subject matter jurisdiction for this action is predicated on 28 U.S.C. § 1338(a) and (b). Personal jurisdiction is not contested.

In a pretrial order dated January 17, 1980 (doc. 34) this Court directed that Campbell be given an opportunity to observe a CPE device in operation. In a pretrial order dated December 17, 1980 (doc. 48) this Court severed for later trial

the issue of damages arising from any liability determination. The issues of infringement, validity, unfair competition, and attorney fee liability were tried to the Court on January 6, 7, 8, 21, 22, 23, and February 4, 5, 6, 11, 12, 1981. At the conclusion of Campbell's case the Court directed a verdict against him on his infringement allegations as to the last three claims (6, 7, 8) of the Gay patent. At the conclusion of final argument the Court indicated that it would hold that Campbell had not sustained his burden of proof on his infringement allegations as to the first five claims of the Gay patent.

After thorough consideration of the testimony and other evidence adduced at trial, as well as the argument and memoranda of counsel, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The Gay patent describes a "method and apparatus for reducing sulphur and ash content of a solid material containing coal ..." (px 1, p. 1). In general, it sets out a means of separating commercially saleable coal from surface mining refuse piles (called "gob" piles) that contain coal and other earthen material. The first step in the process is to crush and screen the gob into particles no larger than 1¼ inches in diameter. The particles are then combined with a high pressure (65 p.s.i.) stream of water in a round tank called a mixing chamber. The mixing of solids and water actually takes place in a hollow cylinder, called a mixing zone, which is described as swinging freely by chains within the mixing chamber. The solids-water mixture is pushed along the bottom of the mixing chamber by a second, low pressure (2 to 5 p.s.i.), stream of water toward an outlet pipe. This second stream of water prevents the buildup of material on the bottom of the mixing chamber. From the mixing chamber outlet pipe the solids-water mixture is pumped into a cyclone separator which has an adjustable vortex finder extending vertically upward out of the cyclone separator and also has, adjacent to its bottom, an outlet made up of three cones of successively decreasing angles—68°, 53°, 7°. The operation of the cyclone separator is such that usable coal along with some water exits through the vortex finder at the top while refuse material and remaining water is then separated from the coal and refuse and recycled (px 1).

The file wrapper of the Gay patent prosecution (px 3) indicates that the application was filed on March 3, 1973 in the name of Larry T. Gay. Of the seven claims tendered in the initial application claims 1 through 6 were rejected (id. at 35). The examiner indicated that claims 1, 3, 4 and 6 were rejected because they were obvious in light of prior art under 35 U.S.C. § 103. For these claims patents identified as Visman I (RE 26,720) (px 3L), which described a cyclone separator, and Eichhorn (2,918,-263) (px 3H), which describes a means of mixing solid particles with a high pressure water stream in a hollow cylinder, were specifically cited as prior art references (px 2 at 35). The examiner indicated that claims 2 and 5 were also rejected because they were obvious in light of prior art under 35 U.S.C. § 103. For these claims the Visman I and Eichhorn patents along with a patent described as Visman II (3,487,923) (px 3M), which describes an apparatus for separating mixtures of solid particles and liquid by means of pumping the solids-liquid mixture from a tank into a cyclone separator, were specifically cited as prior art references (px 2 at 35). The examiner further indicated that claims 1 through 6 were also invalid because the application did not adequately specify the manner and process of making and using the invention as required by 35 U.S.C. § 112. The examiner also cited the following patents as pertinent prior art:

| Gaddis | RE 27,681 | (px 3P) |
| Pardee | 1,149,463 | (px 3A) |
| Krijsman | 2,701,641 | (px 3D) |
| Fontein II | 2,819,795 | (px 3F) |
| French patent | 815,247 | |

as required by 35 U.S.C. § 112.

Pursuant to a successful petition to revive (px 2 at 55), the application was

amended and resubmitted. Claim 6 was deleted, claims 1, 4, 5 and 7 were amended, and two new claims, 8 and 9, were added (*id.* at 37–43). The remarks accompanying the amendments contested the examiner's determination that independent claims 1 and 4 were obvious in view of the Eichhorn and Visman I patents. Specific elements of the Gay system that were emphasized as distinct from the teachings of Eichhorn and Visman I included: (1) a mixing zone centrally located within a mixing chamber (*id.* at 45, 47), (2) the step of introducing a high pressure stream of water downwardly and centrally into the mixing zone (*id.*), (3) a second stream of water into the mixing chamber adjacent to the bottom of the mixing chamber (*id.*), and (4) a second hydrocyclone cone angle of 53° (*id.* at 46, 48). These elements were not added by the amendments, but rather were described in the claims presented in the initial application.

The examiner apparently acceded to the representations made in the remarks accompanying the amendments because in passing on the amended application he rejected claims 1 through 5 but noted that they would be allowed with minor amendment (*id.* at 64–65). The suggested amendments were duly made and the patent was granted on December 16, 1975 (*id.* at 66–75). In the patent as issued claim 7 in the application, which was allowed initially, was renumbered as claim 6. Claims 8 and 9 in the amended application were renumbered, respectively, as claims 7 and 8. Claims 1, 4, 6, 7 and 8 are independent claims; claims 2, 3, and 5 are dependent claims. All eight claims of the Gay patent are set out in the appendix of this opinion.

The equipment accused of infringing on the Gay patent is the coal washing apparatus manufactured by CPE called the "CPE Hydromatic Modular, Multimedia Coal Washer" (doc. 48, p. 2; px 4). The purpose of the CPE coal washer is essentially the same as that of the Gay system, it separates saleable coal from solid particles containing coal and other earthen material. The first step in the CPE process is to crush the solid material into particles no larger than ¾ of an inch in diameter. The particles are then combined with water and dumped into a water-filled rectangular slurry tank. The solids-water combination that goes into the CPE slurry tank is not under pressure, though it does go in at some velocity and the particles undoubtedly bounce off each other as they fall toward an outlet pipe at the bottom of the tank. There is no device within the CPE slurry tank for the purpose of inducing or maintaining a churning action. Rather, the CPE tank is designed to minimize the agitation of the particles. Also, particles build up on the bottom and along the sides of the CPE tank; this buildup serves the purpose of preventing damage to the tank by the abrasive effect of particles colliding with the tank sides. There is no stream of water at the bottom of the tank pushing the particles toward the outlet pipe. From the outlet pipe the particles, along with some water, are pumped into a set of identical cyclone separators each of which has an adjustable vortex finder extending vertically upward out of the cyclone separator and an outlet adjacent to its bottom made up of three cones of successively decreasing angles—67½°, 37½°, 5–10°. The operation of a CPE cyclone separator is the same as that of the Gay cyclone separator, usable coal along with some water exits through the vortex finder while refuse material and the remaining water exits through the bottom. The refuse is then put into a secondary slurry tank from which it is pumped through another set of cyclone separators for the purpose of separating out more coal. The water is eventually separated from the coal and refuse and recycled (px 4, 35a, 35b).

CPE is an Ohio corporation incorporated in 1973. Its majority stockholder and chief operating officer is Walter T. McCartney. In 1969 McCartney and two friends, James Loughner and Russ Campbell, discussed the possibility of recovering saleable coal from gob piles by using a coal washing process that incorporated a cyclone separator. For a number of years prior to 1969 each of these men had been active in coal

mining and coal processing endeavors. During 1968 and early 1969 Loughner had fabricated a cyclone separator which he thought could be utilized in a coal washing plant. The three men incorporated Pennsyltucky Holding Company in July of 1969 and through it obtained a lease on a gob pile near Buffington, Pennsylvania.

In an effort to gain financing for a coal washing plant Russ Campbell contacted defendant Bobby C. Campbell, a physician in Pisgah, Ohio (who is unrelated to Russ Campbell). Dr. Campbell was known to Russ Campbell as someone interested in investing in new business ventures. In March, 1970 McCartney, Loughner, Russ Campbell, and Dr. Campbell met and decided to set up an experimental coal washing plant at the Buffington site [1] using Loughner's cyclone separator. It was also decided that Dr. Campbell would contribute $5,000 to the capital of the corporation and would supply it with the use of a leased pick-up truck. In return for his contribution to capital Dr. Campbell was to receive 65 shares of Pennsyltucky Holding Company stock. McCartney and Loughner were each to receive 65 shares of Pennsyltucky stock also; Russ Campbell was to receive 25 shares. There was discussion among the four shareholders about financing a major plant if the experimental effort proved successful, however no decision was reached.

The Buffington experimental plant was completed in May, 1970 and put into operation for a period of about two weeks. McCartney and Loughner apparently supervised the set-up and operation of the plant; Dr. Campbell never saw the plant in operation. While the Buffington plant never ran continuously for more than an hour, it produced saleable coal.

Loughner, McCartney and Russ Campbell met again with Dr. Campbell and told him that the experiment had been a success and that Pennsyltucky Coal Company should pursue development of a commercial coal washing facility. They told Dr. Campbell that $100,000 would be necessary to finance such a plant and that it was their understanding that Dr. Campbell would raise the necessary capital. Dr. Campbell told them that he thought the best course to take was to obtain more gob pile leases before building a major plant, and that if he was to come up with the funds needed for a major plant he would have to gain control of the corporation by holding 51 percent of the outstanding stock.

McCartney, Loughner and Russ Campbell would not agree to Dr. Campbell's terms, and the Pennsyltucky venture never continued. In a letter to McCartney dated June 26, 1970 (px 36) Dr. Campbell complained that his stock certificates for Pennsyltucky Holding Company had never been issued to him and that the truck he had leased for the company was returned in damaged condition, which he demanded the company pay for. The last paragraph of the letter stated:

> I shall expect some response form [sic] you within the next few days regarding these items. Contrary to what you may or may not have heard most things including pigs usually pay off for me one way or the other.

Dr. Campbell testified at trial that the reference to "pigs" was meant to recall to McCartney a humorous anecdote Dr. Campbell had told him regarding a pig farm venture Dr. Campbell had invested in, and that the reference was not intended as a personal innuendo. McCartney testified that while he did not recall the anecdote, he did not take offense at the "pigs" reference. McCartney apparently never responded to Dr. Campbell's letter.

After the Pennsyltucky endeavor the shareholders went in different directions. Loughner went into designing and manufacturing coal washing plants on his own and continues to do so. The first plant manufactured by Loughner was sold to Recco Coals, Inc., of Bartley, West Virgin-

---

**1.** During trial this site was variously referred to as the Buffington site, the Pennsyltucky plant, and the New Salem Dump.

ia—which was a subsidiary of Whitco Company. This plant, which was referred to throughout the trial as the "Whitco plant," was designed and fabricated in Huntington, West Virginia, during 1971 and installed at the Bartley site in the spring of 1972. The plant had a circuit similar to that used in the Pennsyltucky plant and produced saleable coal from gob piles (dx 20).

In addition to his manufacturing activities Loughner joined with Russ Campbell to form Wasego Corporation. Wasego's principal endeavor was to obtain leases on gob piles that could be processed by Loughner's plants. Russ Campbell did most of the traveling and negotiation needed to obtain the leases.

About a year after the Pennsyltucky operation closed down McCartney teamed up with Russ Campbell to form McCartney & Associates, they worked up a model of a coal washing plant and distributed brochures in an effort to solicit orders for plants they could manufacture. This effort met with no success. In 1973 McCartney teamed up with another person, Harry Fabe, to form CPE. The company went into the manufacture and sale of coal washing equipment. Fabe served as president and chief executive officer; McCartney, as noted above, was chief operating officer. Russ Campbell was hired by CPE in 1974 as manager of field assembly and service. Fabe left the company in 1980; McCartney purchased his stock for $500,000. John Richards was hired to serve as president and chief executive officer of CPE.

In May or June of 1970 Dr. Campbell organized Pisgah Investment Company for the purpose of leasing gob piles and developing coal washing plants. He sold Pisgah stock to about ten investors in order to raise the necessary capital. About $120,000 was obtained. Among the investors were Carl Rose and Thomas Stonerook. Rose had been employed by Pennsyltucky Holding Company and worked at the experimental plant at the Buffington site. Stonerook was an engineer Dr. Campbell met through an airplane club.

Pisgah obtained a lease on a gob pile, called the Shaft dump, near Frostburg, Maryland [2] and set up a coal washing plant at the site. Stonerook and Rose supervised the construction and operation of the plant. Some of the equipment from the Pennsyltucky plant, including the cyclone separator, was used at the Shaft plant.

During late 1970 and early 1971 Stonerook and Rose initiated a patent application on a cyclone separator (px 45). This application was assigned to Pisgah and then abandoned when Stonerook left the employ of Pisgah in June, 1971.

In addition to the Shaft site Pisgah endeavored to establish a coal washing plant at a site called the Ocean mine which was also near Frostburg, Maryland. From the outset Pisgah's operations met with considerable difficulty. The coal washing plant at the Shaft site clogged quite a bit. In early 1971 Dr. Campbell started consulting with Larry T. Gay regarding the difficulties at the Shaft plant. Gay was a machinist and vocational education teacher who was related to Dr. Campbell by marriage. Gay visited the Shaft plant a number of times in the winter and spring of 1971. In July of 1971 Gay went to work for Pisgah full time and was charged with running the Shaft plant and establishing a plant at the Ocean site. At the time Gay came to the Shaft plant it was not operating. Gay made a number of repairs and changes in the equipment. He first changed the slurry tank or mixing chamber of the plant so that crushed gob would be mixed with a high-pressure stream of water in a cylindrical sleeve that hung within the mixing chamber. Gay found that by keeping the solids-water mixture churned up before entering the outlet pipe the clogging problems were avoided. For this reason he also injected a low-pressure water stream adjacent to the bottom of the mixing chamber to push the churning solids-water mixture toward the outlet pipe.

Gay next worked on the cyclone separator in an effort to lower the amount of coal

---

**2.** During trial this site was referred to as the    Frostburg site and the Shaft plant.

in the refuse that came out the bottom of the cyclone along with the water. He found initially that about 22 percent of the refuse was coal. Upon opening the cyclone separator he found that the three metal cones at the bottom were almost completely worn away. Gay had three different combinations of cones fabricated, experimenting with various angles to see which made the cyclone separator perform most efficiently.

It was not until March, 1972 that the Shaft plant began to produce saleable coal. Pisgah was interested in obtaining additional capital investment in order to enhance its operations. In the spring of 1972 Russ Campbell contacted Dr. Campbell about a possible takeover of Pisgah by Wasego Corporation. Dr. Campbell expressed interest. Russ Campbell then visited the Shaft plant and observed its operation for several hours. Russ Campbell reported back to Dr. Campbell, but no merger was pursued.

Gay continued to refine the operations of the Shaft plant. He was encouraged by an acquaintance to explore patentability. Through Robert Reed, who was an airplane club acquaintance of Dr. Campbell, Gay was put in contact with William S. Dorman, a patent attorney in Tulsa, Oklahoma. Dorman visited the Shaft plant in the fall of 1972 and obtained drawings of the plant from Gay. Those drawings and Gay's description of the operation of the Shaft plant in essence made up Gay's patent application. One facet of the Shaft plant was left out of the Gay application, however. Gay's application, and the patent as issued, describe the cylindrical hollow sleeve in the mixing chamber as hanging by chains so it can be swung freely and thereby prevent clogging in the chamber (see px 1, col. 4, ln 2–4). By the time the application was submitted to the Patent Office Gay had put three bars or struts between the wall of the mixing chamber and the hollow sleeve in order to minimize the swinging action of the sleeve. This mode was superior in operation when compared to the free-swinging mode. Gay did not inform his patent attorney of this change.

At the time of the application Gay was aware, through Rose, that a coal washing plant had been operated by Pennsyltucky near Buffington, Pennsylvania. He was also aware, apparently through Rose and Russ Campbell, that Loughner had designed and built a coal washing plant. Through a Patent Office search by his patent attorney Gay learned of the Visman I patent for a cyclone separator (px 3L, 38). He reviewed Visman I and told his patent attorney that the cone angles in his cyclone separator were different from those in Visman I. Also some time before applying for the patent Gay saw a brochure or advertisement depicting and describing a coal washing plant manufactured by McNally-Pittsburg, Inc., which utilized the Visman I cyclone separator (px 17, 17–A). Gay discussed this information with his attorney, noting the resemblance between the McNally-Pittsburg design and the Shaft plant, and also noting the similarities between the Visman I cyclone separator and his own.

Gay's patent application, which was filed March 3, 1973, cited the Visman I patent as a prior art reference. It did not, however, disclose the existence of the Pennsyltucky plant, the Shaft plant, and the Loughner plant, nor did it disclose the McNally-Pittsburgh information. The abandoned cyclone separator patent application made by Stonerook and Rose was also not disclosed, but Gay apparently was not aware of it until after filing his own application.

During 1972 it became evident to Pisgah investors that the Shaft and Ocean operations could not be run profitably. In late 1972 Dr. Campbell, Gay and Reed organized CG Coal Processing Corporation for the primary purpose of preparing and prosecuting the Gay patent application. In February, 1973 Gay assigned all the rights he had in the application then being prepared to CG Coal (doc. 24). Also in late 1972 Dr. Campbell and Reed along with a few other investors organized Cinco Corporation for the purpose of setting up a coal processing operation. Cinco obtained a

lease on a gob pile near Uniontown, Pennsylvania and set up a plant with equipment purchased from Pisgah. The Pisgah operations near Frostburg, Maryland, stopped in early 1973; its assets were sold to Cinco and others. Dr. Campbell and the other Pisgah shareholders received a total return of about $75,000 on their investment of nearly $120,000. Cinco's Uniontown operation was supervised by Gay. It operated only a few weeks before closing down because of disagreements among the men operating it. The investors apparently lost their money.

After the Cinco and Pisgah operation stopped Gay had no further involvement in the coal plant operations. Since 1973 he has built two processing plants based on his design, but has sold only one. He sold his CG Coal stock to Reed in the summer of 1973.

From 1973 until 1977 Dr. Campbell had no involvement in coal processing activities. In March 1977 he sold his CG Coal stock to Reed and purchased the Gay patent from CG Coal for $10,000. Also in 1977 Dr. Campbell and F.W. Schneider entered into a partnership, C & S Coal Reclamation, for the purpose of setting up a coal washing plant at the gob pile formerly leased by Pennsyltucky near Buffington, Pennsylvania. The plant developed by C & S did not use a cyclone separator.

It was in August or September, 1977 that Dr. Campbell secured the lease on the Buffington gob pile for C & S Coal. The lease was obtained from a Mr. Rozak who owned the land underlying the gob pile. During their discussions Dr. Campbell showed Mr. Rozak a copy of the Gay patent. Mr. Rozak remarked that he thought CPE was building plants like those used by Pisgah. Dr. Campbell testified at trial that Mr. Rozak had "been in the coal business for some time." A bit later Dr. Campbell spoke by telephone with a Mr. Lynch and a Mr. Alpie whom Dr. Campbell apparently knew from his involvement with Pisgah. Lynch and Alpie read to Dr. Campbell an article from a coal industry publication regarding the coal washing plants being manufactured by CPE and Loughner. The article listed some of the customers of CPE and Loughner. Later in 1977 Mr. Lynch showed the articles to Dr. Campbell.

During October or November, 1977 Dr. Campbell saw, from a distance, two CPE plants. One was at the Collier dump near Uniontown, Pennsylvania, the other was at the Connellsville, Pennsylvania, airport. Neither plant was in operation at the time. Dr. Campbell did note that the slurry tanks for the CPE plants were rectangular.

Sometime in late 1977 Dr. Campbell discussed the information he had about CPE with Reed, raising the possibility that CPE might be infringing the Gay patent. Reed put Dr. Campbell in touch with Lawrence Johnson, a Tulsa, Oklahoma attorney. Johnson and Dr. Campbell talked about the matter over the telephone. In November of 1977 Johnson and Reed flew to Ohio to meet with Dr. Campbell to discuss the possibility of bringing an infringement action against CPE.

Reed had represented to Dr. Campbell that he had a degree in electrical engineering and was a petroleum engineer. Johnson represented to Dr. Campbell that while he was not certified to practice before the United States Patent Office he had ample experience trying patent cases.

After their meeting Dr. Campbell and Reed drove to a CPE plant that was operating near Connellsville, Pennsylvania. While Dr. Campbell waited in the car, Reed examined the plant. Reed reported to Dr. Campbell that the CPE plant was almost exactly like the Gay plant. After the visit to the CPE plant Reed returned to Tulsa. Dr. Campbell then called Johnson and instructed him to send letters to CPE customers accusing them of infringing the Gay patent. Letters were also sent to customers of Loughner.

In letters dated January 20, 1978 Johnson accused 14 coal-related businesses of patent infringement (px 28a–u). CPE was one of the 14 (px 28k). Each letter reads as follows:

Gentlemen:

I represent Bobby C. Campbell who is the owner of U.S. Patent No. 3926787, "Method and Apparatus for Reducing Sulphur and Ash Content of Coal".

It has come to our attention that you are guilty of infringement of this patent in your business operations.

We call upon you to immediately cease and desist in this infringement and contact the undersigned immediately regarding an accounting as to your income for use of this patent.

In the event you wish to discuss settlement of this controversy, please contact the undersigned. If you reject our claim, please advise in order that we may commence suit.

Very truly yours,
LAWRENCE A. JOHNSON

At trial Dr. Campbell testified that at the time the letters were sent he did not know whether CPE's equipment had a hollow sleeve similar to that in the Gay mixing chamber, he did not know what the cone angles of the CPE cyclone separator were, he did not know the pressure of the water introduced into the CPE slurry tank, and he did not know if there was a low pressure stream of water introduced into the bottom of the CPE slurry tank. Dr. Campbell further testified that he had reviewed the essentials of the Gay patent claims with Reed and Johnson before the letters were sent and that he had relied on their advice in sending the letters. He also testified that he had compared a CPE brochure with the Gay patent.

Neither Reed nor Johnson testified at trial. Johnson was present throughout the trial, serving as co-counsel to Dr. Campbell's trial attorney, William Dorman. It was represented to the Court by Mr. Dorman that Dr. Campbell would not call Johnson as a witness because if he did CPE's trial attorney had indicated CPE would call Mr. Dorman and that if CPE did so Dr. Campbell would be without representation. The advice of the Court was not requested on this point. The Court noted that it could not tell parties which witnesses to call.

Messrs. Rozak, Alpie and Lynch also did not testify.

In response to the infringement letters CPE wrote two letters to Johnson, one dated January 27, 1978 and the other dated February 7, 1978 (px 12A & B). Both letters denied infringement and asked for a specific reference as to which claims of the Gay patent CPE's equipment infringed. Johnson did not respond to these letters.

As noted above, CPE filed its complaint and petition in this action asking for declaratory and injunctive relief as well as damages on March 24, 1978. There apparently was no communication between the parties until just prior to the filing of the complaint. Through the course of this litigation, until trial, Dr. Campbell made no offer to settle this action nor did he offer to withdraw his infringement claims.

Also as noted above, this Court issued a pretrial order on January 17, 1980 directing that Dr. Campbell, his counsel, and his expert witness be given an opportunity to observe a CPE plant in operation. Such an opportunity was afforded, but the operator of the plant, which was located at Madisonville, Kentucky, did not permit the Campbell group to take motion pictures of the plant and CPE did not make any such request of the operator on behalf of the Campbell group. Prior to trial Dr. Campbell's counsel made no request to the Court for its assistance in this matter. At trial Dr. Campbell's counsel requested that the Court view the Madisonville plant in order to resolve a dispute between the experts of the parties as to whether there was turbulence in the CPE slurry tank. This request was denied, the Court ruling that such a view would be for the purpose of gathering evidence and was not an appropriate judicial function. In a post-trial motion Dr. Campbell's counsel asked that the record of the action be reopened for the purpose of allowing motion pictures of the operation of the slurry tank at the Madisonville plant to be taken and entered into the trial record (doc. 70). The motion was denied (docs. 77, 78).

CPE has suffered damages as a result of the infringement accusations of Dr. Campbell. A number of potential customers have refused to purchase CPE plants until the infringement accusations were resolved. Lines of credit with suppliers and banks were extinguished. Most of CPE's employees have been laid off. CPE petitioned for reorganization of its debts under Chapter 11 of the Bankruptcy Act in May, 1980.

News of the infringement allegations spread quickly within the coal washing industry. CPE's sales fell off precipitously after the Johnson letters were sent. CPE took the accusations seriously and instituted this action as a means of resolving the accusations in a sure manner. Except for the infringement letters, no evidence was offered by Dr. Campbell to show he was prepared to resolve his infringement accusations by litigation.

## CONCLUSIONS OF LAW

Four different causes of action were tried to the Court. We will first decide Dr. Campbell's allegation that CPE's plant infringes the Gay patent. Then we will rule on CPE's claim that the Gay patent is invalid. Next CPE's assertion that defendant committed tortious unfair competition will be determined. Finally, CPE's request for attorney fees will be considered.

### A. *Infringement*

As pointed out in the findings of fact, the Gay patent has eight claims, five of which are independent claims—claims 1, 4, 6, 7 and 8. Claims 2, 3 and 5 are dependent claims, and they cannot be infringed if the independent claims upon which they depend are not infringed. *Autogiro Company of America v. United States*, 384 F.2d 391, 408, 181 Ct.Cl. 55 (1967); *Lundy Elec. & Sys., Inc. v. Optical Recognition Sys., Inc.*, 362 F.Supp. 130, 164 (E.D.Va.1973), *affirmed*, 493 F.2d 1222 (4th Cir.1974); see 35 U.S.C. § 112. As noted above, a directed verdict was entered against defendant on his infringement allegations regarding independent claims 6, 7 and 8. Hence our initial focus should be on the infringement allegations regarding independent claims 1 and 4. If they are not infringed, then no claim of the Gay patent is infringed.

Claim 1 defines a method of separating a saleable coal product from a solid material that contains coal. The pertinent elements of claim 1, with bracketed drawing reference numbers, are the steps of

(1) introducing a pre-crushed and pre-screened quantity of said solid material [10] of particle size 1¼ × 0 inch into a mixing zone [54] located centrally within a mixing chamber [12], said mixing zone being open at the top [62] and the bottom [60] and communicating at said bottom with said mixing chamber [12],

(2) introducing a first stream of water [14] downwardly and centrally into said mixing zone at about 65 p.s.i. to create a condition of turbulence within said zone and within said mixing chamber,

(3) introducing a second stream of water [16] into said mixing chamber at about 2 to 5 p.s.i. under substantially quiescent conditions and adjacent the bottom [58] of said mixing chamber [12], [... and]

(4) passing the tangentially moving solids-water mixture further downwardly into contact with a second conical member [113] extending from said first conical member to the bottom of said cyclone separator and having a cone angle of generation approximately equal to 53° [.]

Claim 4 is an apparatus claim which describes the combination of a mixing device with a separating device for the purpose of separating a saleable coal product from solid material containing coal. The pertinent elements of claim 4, with drawing reference numbers noted in brackets, are:

(1) means establishing a mixing zone [54] located centrally within said mixing chamber, said mixing zone [54] being open at the top [62] and the bottom [60] and communicating at said bottom with said mixing chamber [12], [...]

(2) means [14, 78] for introducing a first stream of water downwardly and centrally into said mixing zone [54] to

create a condition of turbulence within said zone and within said mixing chamber [12],

(3) means [16, 17] for introducing a second stream of water into said mixing chamber [12] under substantially quiescent conditions and adjacent the bottom [58] of said mixing chamber [12], [... and]

(4) a second conical member [113] extending from said first conical member [111] to said bottom [84] of said cyclone separator [24] and having a cone angle of generation approximately equal to 53° [.]

It is well established in patent law that infringement is determined by reference to the claims of a patent, and that every element of a claim charged to be infringed must be found in the infringing device. *McClain v. Ortmayer*, 141 U.S. 419, 425, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891); *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 103 (6th Cir.1975); P. Rosenberg, *Patent Law Fundamentals*, § 17.07 (1980).

None of the elements of claims 1 and 4 of the Gay patent set out above are in the accused CPE system.

The slurry tank in CPE system is analogous to the "mixing chamber" described in the Gay patent, however there is nothing in the CPE system analogous to the "mixing zone" described in the Gay patent. The "mixing zone" is a cylindrical sleeve within the mixing chamber. Under the Gay patent the initial combining of the coal material and water takes place in the "mixing zone." The CPE system contemplates that the material is combined with water before it enters the slurry tank.

The high pressure water stream which the Gay patent describes as being introduced into the "mixing zone" for the purpose of creating turbulence is in no way duplicated by the CPE equipment. The coal and water combination that comes into the CPE slurry tank does not come in under pressure, and there is no device in the CPE slurry tank that is meant to create turbulence. Indeed the CPE slurry tank

was designed to minimize agitation in the slurry tank. Also, the CPE slurry tank has nothing similar to the low pressure stream of water introduced adjacent to the bottom of the mixing chamber described in the Gay patent.

Finally, the middle cone angle in CPE's cyclone separator, which is 37½ degrees, is substantially different from that described in the Gay patent, 53 degrees. This difference is especially notable because the second cone angle in the CPE cyclone separator is the same as that in the prior-patented Visman cyclone separator (*see* px 33), and the prosecution history of the Gay patent shows that the second cone angle was an element relied upon to distinguish the Gay cyclone separator from prior art (px 2, p. 45). Such a distinction cannot be disregarded when determining whether there is literal infringement. *Arco Industries Corp. v. Chemcast*, 633 F.2d 435, 439 n. 6 and accompanying text (6th Cir.1980); P. Rosenberg, *supra*, § 17.07[3].

In sum, the accused CPE equipment does not directly infringe all of the elements of independent claims 1 and 4 of the Gay patent. Hence those claims are not infringed. And, because the independent claims they derive from are not infringed, dependent claims 2, 3 and 5 are not directly infringed.

As an alternative to his allegations of direct infringement Dr. Campbell forwards the doctrine of equivalents as a basis for finding the CPE system infringes the Gay patent claims.

The doctrine of equivalents is a judicially developed doctrine that operates to expand the claims of a patent beyond what the meaning of their words can bear. T. Koykka, "Infringement of Patents," 42 F.R.D. 43, 55–56 (1967). "The doctrine does not excuse the omission of an essential element of a claim; it merely holds that the substitution of an 'equivalent' for an essential element does not avoid infringement." *Id.* at 56. *See* P. Rosenberg, *supra*, § 1707[1].

As described by the Supreme Court, the doctrine of equivalents dictates a finding of infringement when

an unauthorized device employs substantially the same means, to achieve substantially the same results, in substantially the same way, as that claimed ... —even though not a single claim of the patent can literally be read on the unauthorized device.

*Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929). *Accord, Graver Mfg. v. Linde,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Arco Industries Corp. v. Chemcast,* 633 F.2d at 438.

The general rubric of the doctrine of equivalents—"performs substantially the same function in substantially the same way to obtain the same result"—is not a particularly workable test. T. Koykka, *supra,* at 63–64. In *Graver Mfg. v. Linde, supra,* the Supreme Court recognized that

[e]quivalence, in patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other, and by the same token, things for most purposes different may sometimes be equivalents.

339 U.S. at 609, 70 S.Ct. at 856. The Court went on to note that a "finding of equivalence is a determination of fact," and set out four factors to be considered when passing on an equivalence issue:

■ the purpose for which an ingredient is used in a patent,

■ the qualities it has when combined with other ingredients, ...

■ the function which it is intended to perform, [and ...]

■ whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

Analyzing the pertinent facts of this action in light of these considerations, we cannot find that the CPE system is equivalent to the apparatus and process described in the Gay patent.

The most important ingredient of the system described in the Gay patent, indeed the item which the defendant represented to be the "invention" of Gay, is the turbulent mixing of coal and water prior to separation by the cyclone separator. The apparatus within the Gay mixing chamber was designed to induce and maintain a churning action in order to keep the coal particles agitated and suspended as they entered the outlet pipe and were pumped into the cyclone separator. The high pressure water stream that comes into the mixing zone and is deflected by the conical baffle initiates the agitation process when the coal particles are dumped into the mixing zone. The second stream of water, which comes into the mixing chamber adjacent to its bottom and opposite the outlet pipe leading to the pump and cyclone separator, moves the churning particles toward the outlet pipe.

The CPE slurry tank, in comparison, does not have any apparatus in it to induce or maintain a churning action. Its design is aimed at minimizing agitation of the coal particles in order to allow buildup of material and thereby avoid abrasion of the tank wall.

The purposes of the Gay mixing chamber and the CPE slurry tank are similar in that they both combine water and coal prior to separation by cyclone separators. Their qualities and function within their respective systems are, however, quite different. The Gay mixing chamber is designed to maximize agitation of the coal and water combination. The CPE slurry tank is designed to minimize agitation. Since the functions of these analogous elements are quite dissimilar, it is doubtful that someone skilled in the art of coal washing would consider them interchangeable.

Dr. Campbell's primary argument on equivalence is that the dumping of a coal-water combination into a CPE slurry tank causes agitation equivalent to the agitation that takes place in a Gay mixing chamber. There is undoubtedly agitation within the CPE slurry tank. As plaintiff's expert witness, Professor Sandy, testified, when coal

particles of different sizes and weights are dumped into a slurry tank they bump into each other as they travel toward the outlet pipe. While it could be, though we doubt it, that the degree of agitation in a CPE slurry tank is about the same as that in a Gay mixing chamber, this result is not achieved in substantially the same way. Thus these ingredients, which are essential to the operation of their respective systems, are not equivalent.

Our conclusion regarding the application of the doctrine of equivalents in this case is strengthened by the policy within the law of giving broad protection from equivalents only to pioneer patents.

> The broadest protection under the doctrine of equivalents is reserved for pioneer or generic patents, which cover a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in an art's progress as distinguished from a mere improvement or perfection of what had gone before.

P. Rosenberg, *supra*, § 17.07[1], p. 17–35. *See Catholic Protection Serv. v. American Smelting & Refining Co.,* 190 USPQ 254, 268–269 (S.D.Texas 1975).

> Where a patent is a pioneer, the patentee is allowed to claim a wide range of equivalents. But where, as here, the patent represents only a small but significant advance because the art is crowded, the doctrine of equivalents is given a correspondingly narrow range.

*Bolkcom v. Carborundum Company,* 523 F.2d 492, 503 (6th Cir.1975). In light of the prior art considered by the patent examiner when passing on the Gay application (px 2, pp. 35–36) and the other prior art introduced by plaintiff (px 3A–S), the best that could be said for the Gay patent is that it is a small advance in a crowded art. Its claims should not be construed broadly when determining equivalence.

■ Even if the doctrine of equivalents did provide a basis for finding infringement in this case, its applicability would be superseded by the doctrine of file wrapper estoppel. This doctrine precludes a patent owner from recapturing in patent litigation the breadth which was given up in procuring the patent from the Patent & Trademark Office. P. Rosenberg, *supra*, § 17.07[2]. The doctrine of fire wrapper estoppel cannot be overruled by the doctrine of equivalents. *Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 136, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942); *Arco Industries Corp. v. Chemcast,* 633 F.2d at 438–439; T. Koykka, *supra,* at 67–68.

A basic statement of the doctrine of file wrapper estoppel is provided in *Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966):

> It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. *Hogg v. Emerson,* 11 How. 587 [13 L.Ed. 824] (1850); *Crawford v. Heysinger,* 123 U.S. 589 [8 S.Ct. 399, 31 L.Ed. 269] (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. *Powers-Kennedy Co. v. Concrete Co.,* 282 U.S. 175, 185–186 [51 S.Ct. 95, 99, 75 L.Ed. 278] (1930); *Schriber Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220–221 [61 S.Ct. 235, 239, 85 L.Ed. 132] (1940).

A "file wrapper" consists of the official record of a case within the Patent & Trademark Office. It includes the application, amendments, and arguments submitted by an applicant. P. Rosenberg, *supra,* § 17.07[2] p. 17–41. It also includes admissions made by an applicant after rejection to clarify the meaning of a claim without rewriting the claim. *Duplan Corp. v. Deering Milliken, Inc.,* 181 USPQ 621, 631–633 (D.S.C.1974); *Welch v. General Motors Corp.,* 330 F.Supp. 80, 83–84 (E.D.Va.1970), *affirmed per curiam,* 170 USPQ 1 (4th Cir.1970).

As noted in the findings of fact, the applicant in this case specifically argued that the mixing zone, the high pressure water stream, the second water stream, and the second cone angle distinguished his apparatus from prior art. We conclude that these elements should be considered limitations for the purpose of determining if the accused equipment infringes. The CPE system has no elements comparable to those specifically argued in the Gay file wrapper. Hence the defendant is estopped from contending that those elements are infringed.

### B. Validity

CPE contends the Gay patent is invalid for any of three reasons: obviousness in view of prior art, failure to disclose the "best mode" of operation, and fraud on the Patent Office. We will deal with these arguments seriatim.

#### 1. *Obviousness*

█ The standard for obviousness is provided by 35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The usual factual determinations a trial court must make to reach a conclusion on obviousness are, first, the scope and content of prior art, second the differences between the prior art and the claims at issue, and third the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693; *Universal Electric Co. v. A.O. Smith Corp.*, 643 F.2d 1240, 1246 (6th Cir.1981).

The starting point in analyzing a challenge to a patent's validity is the statutory presumption of validity. 35 U.S.C. § 282. This presumption is based on the acknowledged experience and expertise of the Patent Office. The issuance of a patent constitutes a type of administrative determination supported by evidence. *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 615 (6th Cir.1978); *Parker v. Motorola, Inc.*, 524 F.2d 518, 521 (5th Cir. 1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). The Sixth Circuit has pointed out that this presumption merely places the burden of proof of invalidity and has no independent evidentiary value. *Universal Electric Co. v. A.O. Smith*, 643 F.2d at 1245; *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 713 (6th Cir.1975), *cert. denied* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975). While it is firmly established that the presumption is greatly weakened when the Patent Office has failed to consider pertinent prior art, *Universal Electric Co. v. A.O. Smith Corp.*, 643 F.2d at 1245, it is just as firmly established in the Sixth Circuit that the presumption is greatly strengthened when the Patent Office has considered the pertinent prior art offered at trial to show obviousness. *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420, 426 (6th Cir.1971), *cert. denied*, 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1972); *Great Lakes Equipment v. Fluid Systems, Inc.*, 217 F.2d 613, 617 (6th Cir. 1954).

The doctrine of strengthened presumption was announced in *Williams Mfg. Co. v. United Shoe Mach. Corporation*, 121 F.2d 273 (6th Cir.1941), *affirmed*, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942). In that case the accused infringer of a shoe manufacturing machine patent challenged the validity of the patent by pointing out functions that were disclosed in prior patents. In upholding the trial court's finding of validity and infringement the Sixth Circuit noted that the most pertinent prior patent relied on to show obviousness was one that had been disclosed to the Patent Office by the applicant for the patent in suit. In light of this fact the Court stated,

To the presumption of validity that attached to a granted patent, where the most pertinent prior art has been cited against it in the patent office, there must probably now be added the force of a growing recognition of finality that is generally being accorded to administrative determinations supported by evidence, on the ground that the administrative agency is expected to have developed an expertness in its specific field beyond what may be expected from the courts wherein adjudications range the whole field of human controversies.

121 F.2d at 277. Thus the Court severely discounted the value of prior art that had been disclosed to the Patent Office as a basis for finding a patent invalid because of obviousness.

In application this doctrine has meant that prior patents that were disclosed to the Patent Office cannot serve as prior art sufficient to support a finding of obviousness. *See, Tapco Products Company v. Van Mark Products Corp., supra; Gibson-Stewart Co. v. Wm. Bros. Boiler and Mfg. Co.,* 264 F.2d 776 (6th Cir.1959), *cert. denied,* 360 U.S. 929, 79 S.Ct. 1448, 3 L.Ed.2d 1544 (1959); *Cold Metal Process Co. v. Republic Steel Corp.,* 233 F.2d 828 (6th Cir.1956), *cert. denied,* 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956). This doctrine has been further extended to prior art which has not been reviewed by the Patent Office but is substantially similar to prior art which was before the Patent Office. *Tapco Products Co. v. Van Mark Products Corp.,* 446 F.2d at 426; *Goodwin v. Borg-Warner Corporation,* 157 F.2d 267, 272–73 (6th Cir.1946), *cert. denied,* 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683 (1946).

The effect of this prior art doctrine in this action is overwhelming. In the expert testimony it presented as well as in its argument CPE primarily relied upon three prior patents to show obviousness: Visman I (px 3L), Eichhorn (px 3H), and Fontein II (px 3F). Each of these three was reviewed by the patent examiner when he ruled on the Gay patent application (px 2, p. 36). Visman I and Eichhorn were specifically

relied upon by the examiner in his initial rejection of six of the seven claims in Gay's application (*id.*) The application was then amended to meet the examiner's objections. Thus the primary prior art references CPE offered to show obviousness were not only before the patent examiner when he reviewed the Gay patent application, they were specifically relied upon by the examiner when he made his rejection and acceptance determinations.

Under the prior art doctrine developed in *Williams Mfg. Co.* and its progeny, the fact that the most pertinent prior art was considered by the patent examiner when passing on the Gay patent serves to strengthen the presumption of its validity. The practical effect of the application of this doctrine in this case is that the three patents CPE relied on most heavily as prior art cannot serve as evidence of obviousness. Without these three patents this Court cannot conclude that CPE has met its burden of proving invalidity.

CPE did, of course, introduce other patents as evidence of prior art. In all, CPE introduced as prior art 16 patents. Of those, seven were reviewed by the patent examiner in passing on the Gay application. Hence there are nine patents cited by CPE that were not reviewed by the Patent Office. None of the nine, however, were discussed in trial testimony or argument. Given the lack of significance CPE accorded the nine unreviewed patents we cannot conclude that they amount to prior art sufficient to overcome the now-heightened presumption of validity.

Patents were not, of course, the only prior art introduced by CPE. Four other items were specifically mentioned: the McNally-Pittsburgh brochure (px 17), a 1971 Coal Mining & Processing magazine article (px 3Q), a 1965 Coal Mining & Processing Magazine (px 3R) and the Whitco plant developed by James Loughner (px 43A–K, 52 A–U).

The brochures and 1971 article cannot be afforded much weight because both discuss application of the cyclone separator and circuit set out in the Visman I patent,

which of course was reviewed by the Patent Office. The 1965 article describes a European coal processing system that utilizes cyclone separators. The description is, however, quite general and the depiction of the system in the article does not appear to be analogous to the diagrams in the Gay patent. The 1965 article cannot be considered pertinent prior art. The Loughner plant is certainly pertinent prior art, however it alone or it combined with the other prior art references that were not reviewed by the patent examiner cannot overcome the strengthened presumption of validity carried by the Gay patent.

## 2. Best Mode

The description of an invention in a patent application "must set forth the best mode contemplated by the inventor of carrying out his invention." The purpose of the "best mode" disclosure requirement is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived. *In re Gay*, 309 F.2d 769, 772, 50 CCPA 725 (1962).

The patentee need not disclose the "optimum" mode of carrying out the invention, nor must he disclose a better method, if he does not know of it. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885, 897 (10th Cir. 1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980). The patentee need only disclose the best mode he conceived for practicing his invention at the time he made application. P. Rosenberg, supra, § 13.04[5][b].

The failure to disclose alleged by CPE in this action is Gay's failure to disclose the three pieces of metal pipe he used to minimize the swinging action of the hollow sleeve in the mixing chamber. The patent says the sleeve is to be hung by chains such that it can swing freely. Gay had installed the pipes in his mixing chamber prior to applying for the patent and he considered them important to the operation of the mixing chamber.

The most recent Sixth Circuit case on "best mode" invalidity is *Union Carbide Corp. v. Borg-Warner Corp.*, 550 F.2d 355 (1977), and it provides excellent precedent for our decision in this action because it contains an analogous fact situation and sets out the standard for deciding a best mode invalidity question.

The patent in suit in *Union Carbide* was for a process for molding thermoplastic articles. The specifications of the patent included a description on a particular type of valve. They also illustrated the "extruder" used in the process as a blank box, meaning any type of extruder could be used. The trial court found that at the time the patent application was filed the inventor had designed and used a valve that performed better than the one described in the patent, and had found that a particular type of extruder worked best in the process. The trial court determined that the inventor had not disclosed the "best mode" in his application and therefore the ensuing patent was invalid. The Sixth Circuit affirmed, holding that, even with the presumption of patent validity provided by 35 U.S.C. § 282, the trial court's findings were supported by substantial evidence and not clearly erroneous.

In reaching its decision, the Sixth Circuit noted that the inventor's failure to disclose the best mode in the application did not have to rise to "the level of active concealment or grossly inequitable conduct in order to warrant invalidation of a patent." 550 F.2d at 363. The inventor need only have known of the better mode and not disclosed it in order to suffer a finding of invalidity. The omission need not have been deliberately concealed. *Id.* at n. 7.

As pointed out in the findings of fact in this opinion, Gay failed to disclose the use of the stabilizing pipes in the mixing chamber. Under the precedent of *Union Carbide* this failure, whether deliberate or inadvertent, is sufficient to invalidate the patent, and the Gay patent will be held invalid for that reason.

### 3. *Fraud on the Patent Office*

The final ground plaintiff forwards for its contention of patent invalidity is that the Gay patent application fraudulently omitted to disclose pertinent prior art to the Patent Office. Plaintiff alleges that the application failed to disclose the prior Pennsyltucky Plant, the prior Shaft Plant, the hydrocyclone designed by Loughner in 1971 (px 37) and the hydrocyclone embodied in the Stonerook & Rose patent application made and abandoned in 1971 (px 45).

■ The defense of fraud on the Patent Office arises out of each applicant's duty of frank and truthful disclosure to the Patent Office of everything that had gone on before with respect to what he is trying to patent. *Layne-New York Co., Inc. v. Allied Asphalt Co., Inc.*, 363 F.Supp. 299, 307 (W.D.Pa.1973). The granting of patents must, of course, be free from fraud or other inequitable conduct. *Precision Co. v. Automotive Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

■ The defense is generally made in two formulations. First, in terms equivalent to common law fraud: (a) representation of (b) a material fact that is (c) false with (d) intent to deceive, and (e) reasonable reliance, and (f) deception by reason of the reliance, and (g) injury. P. Rosenberg, supra, § 15.08 at 15–74. The second formulation is in terms of the equity doctrine of unclean hands; it is used when not all elements of fraud are available. *Winter v. Koratron*, 375 F.Supp. 1, 66 (N.D.Cal. 1974). P. Rosenberg, *supra* at 15–74. The basic difference in the two formulations is that a patent procured by fraud is invalid, whereas a patent tainted by inequitable conduct is just unenforceable. *American Optical Corporation v. United States*, 179 USPQ 682 (Ct.Cl.1973); P. Rosenberg, *supra*, at 15–74.

■ It should be noted that a concealment or nondisclosure is equivalent to a false representation for purposes of a defense of fraud on the Patent Office. *Layne-New York Co., Inc.*, 363 F.Supp. 299 (W.D.Pa.1973). In any case it must be shown that "but for" the omission or misrepresentation the patent claims would not have been allowed. *American Optical*, 179 USPQ at 684.

Under Sixth Circuit precedents a party proceeding with a defense based on either actual fraud or inequitable conduct must show fraudulent intent by "clear, unequivocal and convincing" evidence. *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 371 (6th Cir.1977); *Schnadig Corporation v. Gaines Mfg. Co.*, 494 F.2d 383, 392 (6th Cir.1974). "[M]ere technical fraud is not sufficient to deny enforceability." *Kearney & Trecker, supra* at 271; *see, Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 83 (6th Cir.1971).

■ As CPE's counsel admitted in his closing argument, the failure to mention the alleged items of prior use and design in the Gay patent application only amounted to technical fraud. There was no strong evidence of fraudulent intent on the part of Gay or his attorney, certainly not enough to be "clear, convincing, and unequivocal." The Pennsyltucky Plant was, by virtually all descriptions, an experimental effort, essentially a feasibility test of a theory. For purposes of a fraud defense, there is no duty to disclose a prior use or sales to which there is a *bona fide* basis for believing the use was experimental. *Clark Equipment Co. v. Keller*, 197 USPQ 83, 122 (D.N.D.1976). This rationale can be applied to the Shaft Plant as well because it was at that plant that Gay developed his apparatus. For Gay's purposes the Shaft Plant was experimental.

As for the nondisclosure of the cyclone separator designs of Loughner and Stonerook and Rose, it is apparent that neither Gay nor his attorney were aware of them. Gay did not know of the Stonerook and Rose applications until after he filed his own. Gay knew that Loughner had designed and built a plant, but there was no evidence that Gay knew of the specific designs developed by Loughner or that the plant had been sold or was operating. This lack of knowledge would make it

impossible for Gay to formulate the requisite fraudulent intent to omit. Hence the Gay patent cannot be found invalid for failure to disclose pertinent prior art to the Patent Office.

### C. *Unfair Competition*

In its second cause of action CPE alleges that Dr. Campbell intentionally and improperly interfered with CPE's sales to present and future customers by directing Johnson to send letters to those customers accusing them of patent infringement. These allegations state a claim for unfair competition.

A concise statement of common law unfair competition as it relates to accusations of patent infringement is found in 55 *Am. Jur.2d*, "Monopolies" § 700 (1971):

> Charging a competitor's customers with patent infringement and refusing to sell to them is not unfair competition even though the charges prove false, where infringement charges are made in good faith and it is believed that infringement would result from the use of that which is sold. [*Falcon Lock Co. v. Best Universal Lock Co.*, 362 F.2d 221 (9th Cir.1966).] On the other hand, bad-faith threats of patent infringement suits against persons using a competitor's product have been held actionable. [*Russo v. Thompson*, 294 Mass. 44, 200 N.E. 570 (1936).]

The general rule is that a patent holder has a right to protect his interest by notifying alleged infringers of his claims, even before a decree in his favor has been obtained. He may threaten suit against an alleged infringer but he must act in good faith, not attempt to injure a competitor's business, and confine himself to publicizing only the information necessary for his protection. 2 R. Callmann, *The Law of Unfair Competition, Trademarks, and Monopolies*, § 42.4 at 254–255 (3rd ed. 1968). In this Circuit, as in all other jurisdictions, bad faith is an essential element of unfair competition. *International Industries v. Farbach Chem. Co.*, 145 F.Supp. 34, 37 (S.D.Ohio, 1956), *affirmed,* 241 F.2d 246, 248 (6th Cir.1957); *Oil Conservation Engineering Co. v. Brooks Engineering Co.*, 52 F.2d 783, 786 (6th Cir. 1931); *Alliance Securities Co. v. DeVilbiss Mfg. Co.*, 41 F.2d 668, 670 (6th Cir.1930); *Callmann, supra,* § 42.4 at 255.

CPE's allegations state a claim for a type of unfair competition known as intentional interference with prospective contractual relations. The applicable law is provided by the Restatement (Second) of Torts §§ 766B, 767 and 773. *See Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 9 Ohio Ops.3d 216, 379 N.E.2d 235 (Summit County, 1977); *Reichman v. Drake*, 89 Ohio App. 222, 45 Ohio Ops. 444, 100 N.E.2d 533 (Hamilton County, 1951). These sections are set out below.

§ 766B:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

§ 767:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties. § 773:

One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Section 766B calls for a two step analysis. The first is to determine if there was intentional interference, and the second is to determine if the interference was improper. As for the first step, we have no difficulty concluding that the infringement letters were sent for the purpose of inducing CPE's past and prospective customers not to purchase CPE equipment. Dr. Campbell directed Johnson to send the letters, and the letters expressly claimed infringement and demanded that the addressee cease using CEP equipment. It is quite reasonable to conclude that the intent and impact of these letters was to interfere with the continuing and prospective contractual relations between CPE and its customers.

To determine if the interference was improper we turn to the considerations directed by § 767. The conduct which actually interfered with CPE's contractual relations, sending the infringement letters, was direct and overt. The letters specifically charged infringement and threatened suit, however they did not specify what the nature of the alleged infringement was, indeed they did not identify CPE plants as the accused equipment. The failure to specifically accuse CPE equipment is undoubtedly due to the fact that Dr. Campbell wanted letters sent to the customers of Loughner as well as those of CPE, and Johnson used the same letter for each group of customers. Nevertheless, the letters are neither specific as to the equipment accused or the exact nature of the alleged infringement. The letters did not contain enough information to permit substantiation or verification by the addressees. Further, there was no evidence other than the letters that Dr. Campbell intended to bring suit over the alleged infringement.

Dr. Campbell's motive in sending the letters was ostensibly to protect his rights in the Gay patent. A review of the events of the eight years preceding the letters, however, provides a strong basis for a conclusion that Dr. Campbell was motivated by ill will and vindictiveness. After his disharmonic parting with McCartney and Loughner over the Pennsyltucky operation in 1970 Dr. Campbell participated in two unsuccessful coal washing ventures, first Pisgah then Cinco. He lost substantial amounts of money; investors whom he had found for the ventures lost substantial amounts of money. At the same time Dr. Campbell was experiencing these failures, McCartney and Loughner were experiencing success. Both were manufacturing and selling coal washing plants for a growing industry. Dr. Campbell was undoubtedly jealous of this success, and was undoubtedly resentful as well because the success of McCartney and Loughner stemmed in part from the experimental efforts at the Pennsyltucky plant, a plant which Dr. Campbell helped finance. The letter Dr. Campbell wrote to McCartney in June, 1970, which stated, "[c]ontrary to what you may or may not have heard most things including pigs usually pay off for me in one way or the other," is indicative of Dr. Campbell's bad motive. That the "pigs" reference may have been intended as a humorous remark does not belie Dr. Campbell's assertion that he intended to make his investments "pay off" no matter what the means. It is fair to conclude that he considered infringement accusations against CPE and its customers, which carried the hope of gaining some remuneration, a means of making his unsuccessful coal washing ventures "pay off." It is readily apparent that, while Dr. Campbell had no direct relation with McCartney for nearly eight years, he still harbored animus

toward McCartney as a result of their prior association.

The interests of CPE that were interferred with by the infringement letters were substantial. CPE had an ongoing business that manufactured million dollar plants. Its reputation within the coal washing industry was obviously good prior to the letters because of the growth it had experienced. The infringement accusations had an immediate and substantial impact on CPE's sales, reputation, and ability to continue in business. The interests that Dr. Campbell sought to advance by making the infringement accusations were small by comparison. These were of course the rights incident to the Gay patent. But these rights had relatively little value. Only two plants based on the Gay patent had been made, and only one of those had been sold. There was no evidence that Dr. Campbell intended any commercial or personal use of the Gay patent. The social interest in protecting Dr. Campbell's freedom to protect his patent rights pales in comparison to the social value of the contractual relations of CPE which were interfered with by Dr. Campbell's action.

As noted above, bad faith must be shown in order to prove an allegation of unfair competition stemming from accusations of patent infringement. This requirement is mirrored by Restatement section 773 which holds that a good faith assertion of an interest or a good faith threat to protect an interest does not amount to an improper interference into the contractual rights of another even if it intentionally causes a third person not to enter into a contractual relation.

■■■■ Good faith refers to a state of mind and, in this context means that the speaker sincerely believes in the truth of his infringement accusation. Good faith is presumed until the contrary is established. Callmann, *supra*, § 42.4. Our review of the facts of this case and the considerations outlined in Restatement § 767 leads us to conclude that CPE has rebutted the presumption of good faith. Accusations of infringement must be made with extreme accuracy and caution, and, to the maximum extent possible, in such a manner that they may be substantiated and verified. Callmann, *supra*. The infringement letters sent by Johnson did not meet this standard. Further, there was no evidence that Dr. Campbell stood ready to protect his rights in the Gay patent by litigation. Rather, his threats of suit were empty gestures intended to injure CPE's business. Callmann, *supra*.

■■■ Dr. Campbell's testimony that he relied on the advice of Reed and Johnson in sending the infringement letters, which could support an inference of good faith, was substantially undercut by the fact that neither Reed nor Johnson testified. It is a well-settled rule that if a party knows of the existence of an available witness on a material issue and such witness is within his control, and if, without satisfactory explanation, he fails to call the witness, the trier of fact may draw the inference that the testimony of the witness would not have been favorable to that party. 29 Am. Jur.2d, Evidence § 180 (1967). Reed and certainly Johnson were within the control of Dr. Campbell in that they both had a relationship with Dr. Campbell—friendship, employment—that made it likely that their presence could have been procured by Dr. Campbell. *Id.* No explanation was offered for Reed's failure to testify. The explanation offered for Johnson's failure to testify, that his doing so would ultimately lead to Dr. Campbell's being without representation at trial, was not satisfactory. At the time this explanation was offered the Court stood ready to advise that Johnson could testify without having to resign as co-counsel because his refusal to testify or to continue as co-counsel would work a substantial hardship on his client. ABA Code of Professional Responsibility DR5–101(B)(4); S.D.Rule 2.4.7. The Court's advice was not sought.[3] The absence of testi-

---

**3.** This was not the only time Dr. Campbell's counsel failed to seek the Court's aid in the face of adverse circumstances. As noted in our findings of fact, Dr. Campbell's group was not per-

mony by Messrs. Rozak, Lynch and Alpie, who supposedly advised Dr. Campbell during his investigation of the similarity of the CPE and Gay plants, and who appeared to be in the control of Dr. Campbell for evidentiary purposes, also weighs against an inference of good faith on the part of Dr. Campbell.

A number of the incidents described by Dr. Campbell in his testimony also militate against an inference of good faith on his part. First, his supposed reliance on the advice of Reed and Johnson seems at a minimum misplaced because neither was apparently skilled in the coal-washing art. Second, the trip Dr. Campbell and Reed took to the CPE plant near Connellsville, Pennsylvania, in November of 1977 seems more a charade than an investigation. From his trial testimony it was obvious that Dr. Campbell had sophisticated knowledge of the coal washing art; his choosing to stay in the car while Reed examined the plant seems more an attempt to maintain a facade of ignorance rather than an investigatory effort. Finally, Dr. Campbell's testimony that, at the time the infringement letters were sent, he did not know if the CPE equipment had the various devices that the Gay patent supposedly innovated is not credible in light of his level of knowledge in the coal washing art and in light of the fact that he compared the Gay patent (px 1) to CPE's detailed brochure (px 4).

In sum, we conclude from a preponderance of the evidence that Dr. Campbell intentionally and improperly interfered with CPE's continuing and prospective contractual relations with established and prospective customers by directing Johnson to send letters accusing infringement to those customers. Dr. Campbell was primarily motivated by ill will, not a desire to protect his patent rights, and he gave the directive without a good faith belief that infringement existed. Dr. Campbell has therefore committed unfair competition and is liable to CPE for all damages arising from his tortious conduct. As noted in the findings of fact, CPE did suffer damages as a result of Dr. Campbell's actions. The extent of CPE's damages was not pursued at trial because that issue had been severed for later resolution in light of our liability determination. The discussion of damages in the findings of fact should not be considered as defining or limiting the scope of Dr. Campbell's liability.

### D. *Attorney fees*

CPE has requested that it be awarded attorney fees pursuant to 35 U.S.C. § 285: "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." CPE contends that Dr. Campbell has asserted the validity and infringement of the Gay patent in bad faith.

An award of attorney fees under § 285 must be based upon a specific finding that the case is an exceptional one because of fraudulent, malicious, inequitable or other bad faith conduct on the part of the losing party. *Park-Ohio Industries,*

---

mitted to take motion pictures at a CPE plant. Dr. Campbell's counsel never requested the Court's intervention in this regard. During trial the Court was asked to view the CPE plant in operation; the request was denied because the Court felt that doing so would be for the purpose of gathering evidence. In a post-trial memorandum (doc. 70) Dr. Campbell's counsel requested that the trial record be reopened so that such motion pictures could be made and entered in the record. Such a request is, of course, addressed to the discretion of the trial judge, and should be granted only when the evidence to be gathered appears necessary to prevent injustice and is reasonably available. *Calage v. University of Tennessee,* 544 F.2d 297

(6th Cir.1976). As we noted in our decision denying the request (doc. 77), the evidence sought would just be cumulative. The memorandum of Dr. Campbell's counsel also suggested that the Court's reason for not viewing the CPE plant was inadequate by asserting that gathering evidence was "exactly what [a trier of fact] does when it makes a visit to ... a location or building remote from the courthouse in a civil trial." This assertion is entirely incorrect. A view is not allowed for the purpose of gathering evidence, rather it is only for the purpose of aiding the trier of fact in its understanding of evidence admitted at trial. 75 Am.Jur.2d Trial § 84 (1974).

*Inc. v. Letica Corp.*, 617 F.2d 450, 454 (6th Cir.1980); *Campbell v. Spectrum Automation Co.*, 601 F.2d 246, 251 (6th Cir.1979); *Deyerle v. Wright Mfg. Co.*, 496 F.2d 45, 55 (6th Cir.1974); *Uniflow Mfg. Co. v. King-Seeley Thermos*, 428 F.2d 335, 341 (6th Cir.1970), *cert. denied*, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Hoge Warren Zimmermann Co. v. Nourse & Co.*, 293 F.2d 779, 784 (6th Cir.1961). The request is addressed to the discretion of the Court, *Park-Ohio Industries, Inc. v. Letica Corp.*, 617 F.2d at 454; *Hoge Warren Zimmermann Co. v. Nourse & Co.*, 293 F.2d at 784, and can be granted only in regard to patent-related claims. If an action embodies both patent and nonpatent claims, attorney fees pursuant to § 285 cannot be allowed for the nonpatent claims. *Deyerle v. Wright Mfg. Co.*, 496 F.2d at 55; *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 297 (9th Cir.1969); *Time Mechanisms, Inc. v. Qonaar Corp.*, 194 USPQ 500, 509 (D.N.J.1976); *cf. Alyeska Pipeline Corp. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Further, the focus must be on the conduct of the parties during the prosecution of the action, rather than their conduct prior to the filing of the action or the quality of their proof. *See Eltra Corp. v. Basic, Inc.*, 599 F.2d 745, 758 (6th Cir.1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979).

█ In the context of the prosecution of this action we cannot conclude that Dr. Campbell or his counsel acted in bad faith or otherwise inequitably in regard to the patent-related claims of invalidity and infringement, even though Dr. Campbell acted in bad faith when asserting infringement in the letters to CPE and its customers. It was pointed out in argument that Dr. Campbell presented no evidence relevant to the infringement allegations regarding claims 6, 7 and 8 of the Gay patent. This lack of proof was the reason for the Court's directed verdict against Dr. Campbell on those claims. CPE had not been told that no evidence would be presented on claims 6, 7 and 8, and prepared and presented evidence showing no infringement of them as part of its case. While Dr. Campbell's failure to present proof on some of his infringement allegations may have put an extra, unnecessary burden on CPE in the prosecution of this action, we do not think his failure rises to the level of injustice necessary to brand this action "exceptional" under 35 U.S.C. § 285.

## CONCLUSION

For the foregoing reasons we hold as follows:

1. The Hydromatic Modular, Multimedia Coal Washer manufactured and sold by plaintiff Coal Processing Equipment, Inc., does not infringe any claim of U.S. Letters Patent No. 3,926,787 (the Gay patent).

2. Each claim of U.S. Letters Patent No. 3,926,787 (the Gay patent) is invalid and void because of the patent applicant's failure to disclose the best mode contemplated for carrying out his invention at the time of his application.

3. Defendant Bobby C. Campbell is liable to plaintiff Coal Processing Equipment, Inc., for all damages to plaintiff arising from defendant's commission of tortious unfair competition against plaintiff.

4. The request of Plaintiff Coal Processing Equipment, Inc., for attorney fees pursuant to 35 U.S.C. § 285 is denied.

There being no just reason for delay, the Clerk of Court will be directed to enter judgment on the above-described matters pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The Court will by later order schedule the necessary pretrial and trial for the purpose of determining unfair competition damages.

## ORDER

The issues of patent infringement, patent validity, liability for common law unfair

competition, and liability for attorney fees under 35 U.S.C. § 285 in this action were tried to the Court on January 6, 7, 8, 21, 22, 23 and February 4, 5, 6, 11, 12, 1981—the issue of the amount of damages arising from any liability determination having been severed for later trial (doc. 48).

For the reasons set out in the opinion filed concurrently with this order, and because there is no just reason for delay, the Clerk of Court is directed to enter judgment as follows pursuant to Rule 54(b) of the Federal Rules of Civil Procedure:

1. The Hydromatic Modular, Multimedia Coal Washer manufactured and sold by plaintiff Coal Processing Equipment, Inc., does not infringe any claim of U.S. Letters Patent No. 3,926,787 (the Gay patent).

2. Each claim of U.S. Letters Patent No. 3,926,787 (the Gay patent) is invalid and void because of the patent applicant's failure to disclose the best mode contemplated for carrying out his invention at the time of his application.

3. Defendant Bobby C. Campbell is liable to plaintiff Coal Processing Equipment, Inc., for all damages to plaintiff arising from defendant's commission of tortious unfair competition against plaintiff.

4. The request of Plaintiff Coal Processing Equipment, Inc., for attorney fees pursuant to 35 U.S.C. § 285 is denied.

So ordered.